[No. A128721. First Dist., Div. One. June 30, 2011.]

MICHAEL NI, Plaintiff and Appellant, v.
WARREN SLOCUM, as Chief Elections Officer, etc., Defendant and
Respondent.

1638

**1640**

**COUNSEL**

DLA Piper, Steven G. Churchwell, Stanley J. Panikowski and David Dell for Plaintiff and Appellant.

BuckleySandler and Donna L. Wilson for Electronic Signature and Records Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Evans & Page and Corey A. Evans for Citizens in Charge, The Humane Society of the United States and National Taxpayers Union as Amici Curiae on behalf of Plaintiff and Appellant.

Antonio Gonzalez for Southwest Voter Registration Education Project as Amicus Curiae on behalf of Plaintiff and Appellant.

Joe Trippi as Amicus Curiae on behalf of Plaintiff and Appellant.

Gautam Dutta for Asian American Action Fund as Amicus Curiae on behalf of Plaintiff and Appellant.

Michael P. Murphy, County Counsel, Brenda B. Carlson, Chief Deputy County Counsel, and David A. Silberman, Deputy County Counsel, for Defendant and Respondent.

Kamala D. Harris, Attorney General, Douglas J. Woods, Acting Assistant Attorney General, Constance L. LeLouis, Assistant Attorney General, and Hiren Patel, Deputy Attorney General, for Secretary of State Debra Bowen as Amicus Curiae on behalf of Defendant and Respondent.

**OPINION**

**MARGULIES, J.**—To qualify an initiative measure for the election ballot, its proponents must submit to county elections officials a petition endorsed by

a statutorily specified number of eligible voters. Initiative petition endorsement is ordinarily a pen-and-paper affair. Proponents of a recent initiative to legalize marijuana, however, submitted to respondent Warren Slocum, the chief elections officer of San Mateo County (the County), a digital memory device containing an electronic image of an initiative petition. The petition contained a single signature, that of Michael Ni (hereafter petitioner), which he had inscribed on the electronic image of the petition by tracing it on the screen of his smartphone. Using the same signature, petitioner had also executed the required declaration by the circulator of the petition, attesting to the genuineness of his signature. The County rejected petitioner's electronic signature, explaining he had not "personally affixed" it to the petition, as required by Elections Code section 100.

Petitioner unsuccessfully sought a writ of mandate requiring the County to accept his electronic signature. We agree with the County that use of an electronic signature to endorse an initiative petition is not contemplated by the Elections Code and affirm the trial court's denial of the writ.[1]

## I. BACKGROUND

Petitioner is a registered voter residing in San Mateo County. In February 2010, he filed a verified petition for a writ of mandate and complaint for declaratory relief, seeking an order compelling the County to accept his electronic signature on an initiative petition and declaring electronic signatures to be a valid means of endorsing such petitions. The petition and complaint alleged that the proponents of initiative No. 1377, an initiative to legalize marijuana use in California (hereafter the marijuana initiative), had agreed to work with Verafirma, Inc. (Verafirma), a developer of electronic signature software, to test the use of such signatures in the endorsement of initiative petitions. During the signature drive to place the marijuana initiative on the ballot, petitioner reviewed a copy of the initiative petition on the Internet and endorsed the online petition by using Verafirma's software to "sign[] it on an iPhone screen." A copy of the petition bearing petitioner's signature was submitted to County election officials in electronic form, but the County refused to accept the electronic signature.

---

[1] We recognize that petitioner's appeal is doubly moot, since the initiative in question not only qualified for the ballot without his signature, but also was voted down in the election. We nonetheless exercise our discretion to decide the matter because " 'it raises important issues that are capable of repetition but likely to evade review.' " (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142, fn. 2 [105 Cal.Rptr.3d 424, 225 P.3d 554].) Such an exercise is particularly appropriate in a matter of " 'continuing public interest,' " as this one is. (*Californians for Fair Representation—No on 77 v. Superior Court* (2006) 138 Cal.App.4th 15, 22 [41 Cal.Rptr.3d 148].)

In support of the petition and complaint, petitioner submitted a declaration from a cofounder of Verafirma, Michael Marubio, explaining the company's method for creating an electronic signature. Using the company's software, a voter can view a copy of an initiative petition on a personal computer screen, use the screen of a "mobile touchscreen device" to trace the required signature and printed name and address, and cause an image of those tracings to appear on an electronic copy of the petition. According to Marubio, Verafirma's software uses " 'signature dynamics' " technology, an electronic signature technology approved for use in California (see Gov. Code, § 16.5), and it complies with existing California statutory and regulatory requirements for electronic signatures used in connection with commerce and other governmental activities. A signature created using Verafirma's software is unique, capable of verification, under the sole control of the signer, and protected against manipulation.

In opposition, the County submitted a declaration from an elections official stating that on February 9, 2010, the San Mateo County Elections Office (County Elections Office) received a memorandum from the California Secretary of State warning elections officials that one or more counties were likely to receive "electronic devices" containing initiative petitions with electronic signatures. The memorandum stated that, after reviewing the issue, the Secretary had concluded electronic signatures do not satisfy the statutory requirement that a voter "personally affix" his or her signature, printed name, and address to an initiative petition.

Shortly thereafter, the County Elections Office received from the marijuana initiative proponents, along with ordinary signed paper copies of the petition, a portable digital memory device, known as a "thumb drive." The thumb drive held an image of the marijuana initiative petition. In the space provided for voter endorsement on the petition were the signature "Michael Ni" and petitioner's handwritten name and street address. Petitioner's city of residence and zip code were also included, written in typeface rather than by hand. Petitioner had also executed the required circulator's declaration, stating that he witnessed his signature and that it was genuine. After careful examination, it appeared to the County that the same signature and printed name and address had been used for endorsing the petition and executing the circulator's declaration.

In a certification sent to the Secretary of State, the County Elections Office deemed petitioner's signature invalid because it was submitted electronically. The County apparently did not attempt to determine whether petitioner's signature otherwise satisfied statutory requirements. If it had done so, the official explained, elections officials would have visually compared the signature and address on the petition with the signature and address on

petitioner's voter registration affidavit, which was maintained in electronic form in the County Elections Office.

The trial court denied the petition in a detailed written decision. The court concluded the thumb drive submitted to the County did not comply with statutory requirements for submission of an initiative petition, which the court construed to require the submission of a paper petition. In addition, the court concluded the use of an electronic signature was impermissible because it did not allow elections officials to determine whether the voter personally affixed his or her signature to the petition, as required by statute.

## II. DISCUSSION

Petitioner contends the County was required to accept his electronic signature and address information as compliant with the statutory require-ments for endorsement of an initiative petition under the Elections Code.[2]

 In interpreting statutory provisions, our task "is 'to ascertain and effectuate legislative intent.' " (*Bernard v. Foley* (2006) 39 Cal.4th 794, 804 [47 Cal.Rptr.3d 248, 139 P.3d 1196].) " '[I]t is well settled that we must look first to the words of the statute, "because they generally provide the most reliable indicator of legislative intent." ' " (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1394 [117 Cal.Rptr.3d 377, 241 P.3d 870].) In examining a statute's words, we " ' "giv[e] them their 'usual and ordinary meanings' and constru[e] them in context." ' " (*People v. Allegheny Casualty Co.* (2007) 41 Cal.4th 704, 708–709 [61 Cal.Rptr.3d 689, 161 P.3d 198].)

If the statutory language is unambiguous, our inquiry ends. (*Pineda v. Bank of America, N.A., supra,* 50 Cal.4th at p. 1394.) On the other hand, "[i]f the language is susceptible of multiple interpretations, 'the court looks "to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." [Citation.] After considering these extrinsic aids, we "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute . . . ." ' " (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1063 [116 Cal.Rptr.3d 530, 239 P.3d 1228].) Statutory interpretation is a question of law, which we review de novo. (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724 [122 Cal.Rptr.3d 331, 248 P.3d 1185].)

---

[2] We do not address the trial court's holding that paper petitions, rather than memory devices, must be submitted to elections officials. We assume that future initiative proponents can submit the electronic images of a petition in hard copy, if necessary.

## A. *The Statutory Background*

■ The California Constitution provides that an initiative measure must be placed on the ballot if the proponents present a petition signed by a sufficient number of voters—5 percent, for a statutory provision, or 8 percent, for a constitutional amendment, of the total votes cast for gubernatorial candidates in the last election. (Cal. Const., art. II, § 8, subds. (b), (c); see *Strauss v. Horton* (2009) 46 Cal.4th 364, 386, 393, fn. 2 [93 Cal.Rptr.3d 591, 207 P.3d 48].) The signing of initiative petitions is governed by Elections Code sections 100 and 100.5, with the pertinent requirements of section 100 reiterated in Elections Code section 9020. Section 100 states, in pertinent part, "[n]otwithstanding any other provision of law," initiative petitions may be signed only by persons who are "eligible registered voter[s]" at the time of signing. When signing, the voter must "personally affix" his or her signature, printed name, and place of residence to the petition.[3] (§ 100.) Section 100.5 provides that a voter who is "unable" to personally affix his or her printed name and address to a petition may be assisted in doing so, if the person assisting also provides a signature. Assisted voters, however, are still required to "personally affix" their "mark or signature" to the petition. (See *Capo for Better Representation v. Kelley* (2008) 158 Cal.App.4th 1455, 1463 [71 Cal.Rptr.3d 354] [§ 100.5 available only to voters who are "disabled" from writing their printed name and address].)

■ Each copy of the petition submitted to elections officials must be accompanied by a declaration under penalty of perjury, signed and dated by the "circulator" of the petition. (Elec. Code, § 104, subds. (a), (c); see *Friends of Bay Meadows v. City of San Mateo* (2007) 157 Cal.App.4th 1175, 1190 [68 Cal.Rptr.3d 916].) The declaration must state that the declarant circulated the petition, witnessed each of the signatures "being written," and believes each signature to be the genuine signature of the person whose name it purports to be. (Elec. Code, § 104, subd. (b).) The petition must also include, "in the circulator's own hand," the circulator's printed name and address and the

---

[3] The full text of *Elections Code section 100* reads: "Notwithstanding any other provision of law, whenever any initiative, referendum, recall, nominating petition or paper, or any other petition or paper, is required to be signed by voters of any county, city, school district, or special district subject to petitioning, only a person who is an eligible registered voter at the time of signing the petition or paper is entitled to sign it. Each signer shall at the time of signing the petition or paper personally affix his or her signature, printed name, and place of residence, giving street and number, and if no street or number exists, then a designation of the place of residence which will enable the location to be readily ascertained. A space at least one inch wide shall be left blank after each name for the use of the elections official in verifying the petition or paper. The part of a petition for the voters' signatures, printed names, and residence addresses and for the blank spaces for verification purposes shall be numbered consecutively commencing with the number one and continuing through the number of signature spaces allotted to each section. The petition format shall be substantially in the following form: [graphic omitted]."

dates between which the signatures to the petition were obtained. (Elec. Code, § 104, subd. (a).) Any person who is a voter or is qualified to register as a voter may circulate an initiative petition. (Elec. Code, § 102.)

The requirement that a signer "personally affix" information upon endorsing an initiative petition is long-standing. It was first added to an ancestor of Elections Code section 100, former Political Code section 1083a, in 1933, when the statute was amended to require that a signer "himself affix" his address to the petition. (Stats. 1933, ch. 936, § 2, p. 2471; see *Thompson v. Kerr* (1940) 16 Cal.2d 130, 131 [104 P.2d 1021] [quoting successor statute].)[4] In 1961, "himself affix" was changed to the gender-neutral "personally affix" in another predecessor to Elections Code section 100, former section 45 of the Elections Code.[5] (Stats. 1961, ch. 23, § 45, p. 584.) The relevant portion of Elections Code section 100 is materially the same as the 1961 text of Elections Code former section 45.

■ The small number of decisions construing "personally affix" establish only that the phrase requires each signer himself or herself to inscribe the information required by Elections Code section 100. (See *Gooch v. Hendrix* (1993) 5 Cal.4th 266, 281 [19 Cal.Rptr.2d 712, 851 P.2d 1321] [enforcing similar requirement in Elec. Code, former § 1006]; *Friends of Bay Meadows v. City of San Mateo, supra,* 157 Cal.App.4th at pp. 1188–1189; *Capo for Better Representation v. Kelley, supra,* 158 Cal.App.4th at pp. 1462–1463; *Mapstead v. Anchundo* (1998) 63 Cal.App.4th 246, 270–271 [73 Cal.Rptr.2d 602].) The necessary printed information—voter name and address—may be typed onto the petition rather than written in by hand, so long as the voter does the typing. (*Mapstead v. Anchundo,* at p. 271.)

■ The requirement in Elections Code section 100 that the voter include his or her printed name and address is critical to the verification process. As noted above, only an "*eligible* registered voter" may be counted for purposes

---

[4] Language requiring a signer to "affix" information is even older, having originated two years after the 1913 enactment of former Political Code section 1083a, when an amendment required the signer of a petition to "affix thereto" the date of signing. (Stats. 1913, ch. 138, § 1, p. 225; Stats. 1915, ch. 138, § 3, p. 286.)

[5] Interestingly, the phrase "personally affix" was deleted from the statute in 1976 when the substance of Elections Code former section 45 was moved to former section 41 of the Elections Code, which initially required each signer merely to "include" his or her printed name and address. (Stats. 1976, ch. 226, § 2, pp. 432–433.) It was restored in 1987, before Elections Code former section 41 was recodified as section 100 in 1994. (Stats. 1987, ch. 993, § 1, p. 3325; Stats. 1994, ch. 920, § 2, pp. 4693–4694.) The legislative history of the 1976 act does not reveal why the language was deleted, but the Legislature's restoration was intended to make this provision consistent with a similar statute governing practices for county initiatives. (See Assem. Com. on Elections, Reapportionment and Constitutional Amends., Analysis of Assem. Bill No. 2488 (1987 Reg. Sess.) as amended Apr. 20, 1987, p. 1.)

of ballot qualification. (Elec. Code, § 100, italics added.) An eligible registered voter is a person who has not only registered to vote but also continues to reside at the address listed on his or her voter registration affidavit. (*Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 647 [180 Cal.Rptr. 297, 639 P.2d 939]; see Elec. Code, §§ 2116, 2119 [a registered voter who moves is no longer eligible to vote unless he or she reregisters or notifies county officials of the change of address].) Pursuant to Elections Code section 105, when verifying the signatures on an initiative petition election officials must "determine that the residence address on the petition or paper is the same as the residence address on the affidavit of registration." If the addresses are different, or if the petition omits any of the address information, the signature is invalid. (*Ibid.*; see, e.g., *Friends of Bay Meadows v. City of San Mateo, supra*, 157 Cal.App.4th at pp. 1188–1189.)

 There is additional value in the requirement that the signer *personally* affix his or her name and address. "[T]he requirement that signers 'personally affix' printed names and addresses . . . is neither redundant nor insignificant. Both the additional attention of the signer (who must 'personally affix' the information) and the result (the additional ability to verify that the signer was actually involved in the process) aid in preventing forgery and other potential abuse. [Citations.] In addition, the requirement that the signer 'personally affix' the information ensures that the signer, at the time of signing, has actually affirmed the residence address placed on the petition. This affirmation goes to the very heart of the process—the Registrar's ability to verify whether those who signed the petition were entitled to do so." (*Mapstead v. Anchundo, supra*, 63 Cal.App.4th at p. 270.) Accordingly, signatures must also be declared invalid if the election official concludes that some person other than the signer inscribed the signer's address information on the petition—even if the address is the same as the one on the voter registration affidavit. (*Gooch v. Hendrix, supra*, 5 Cal.4th at p. 281 [construing similar requirement in Elec. Code, former § 1006]; *Capo for Better Representation v. Kelley, supra*, 158 Cal.App.4th at pp. 1462–1463; *Mapstead v. Anchundo*, at pp. 270–271.)

B. *Existing Statutory Authorization for Electronic Signatures*

As an initial matter, petitioner and an amicus curiae, the Electronic Signature and Records Association, argue the use of electronic signatures is authorized by two statutes other than Elections Code section 100, Government Code section 16.5 and the Uniform Electronic Transactions Act (UETA) (Civ. Code, § 1633.1 et seq.). Government Code section 16.5 states: "In any written communication with a public entity . . . in which a signature is required or used, any party to the communication may affix a signature by use of a digital signature . . . ." More succinctly, the UETA provides: "If a

law requires a signature, an electronic signature satisfies the law." (Civ. Code, § 1633.7, subd. (d).) Interpreting identical language in the Utah UETA, that state's Supreme Court has concluded electronic signatures can be used to endorse candidate nominating petitions. (*Anderson v. Bell* (2010) 2010 UT 47 [234 P.3d 1147, 1155–1156] (*Anderson*).)

■ While we acknowledge the Legislature has, through these provisions, expressed general approval of the use of electronic signatures in commercial and governmental transactions, we conclude neither statute requires the acceptance of electronic signatures for the endorsement of initiative petitions. Elections Code section 100, which expressly governs the signing of such petitions, begins, "Notwithstanding any other provision of law . . . ." Use of that phrase "expresses a legislative intent 'to have the specific statute control despite the existence of other law which might otherwise govern' " (*People v. Franklin* (1997) 57 Cal.App.4th 68, 74 [66 Cal.Rptr.2d 742]) and " 'declares the legislative intent to override all contrary law' " (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 983 [95 Cal.Rptr.3d 588, 209 P.3d 923], italics omitted). Based on this prefatory language, we conclude the Legislature intended section 100, and not any other arguably applicable statute, to govern the manner of endorsing an initiative petition.

■ Petitioner and amicus curiae argue Elections Code section 100 must be covered by the UETA because it is not among the many enumerated exemptions from the UETA. (See Civ. Code, § 1633.3, subd. (b).) The prefatory phrase "Notwithstanding any other provision of law," however, self-exempts Elections Code section 100 from the UETA. To the extent the requirements of Elections Code section 100 are inconsistent with an electronic signature, any contrary requirement in the UETA is rendered irrelevant by this phrase. For that reason, the Legislature's failure expressly to exempt Elections Code section 100 from the UETA is legally immaterial.

■ Even in the absence of Elections Code section 100's introductory phrase, however, we would not find either Government Code section 16.5 or the UETA determinative. For purposes of argument, we assume that one or both of these statutes deems an electronic signature to satisfy the requirement of a "signature" in Elections Code section 100.[6] Elections Code section 100,

---

[6] In making this assumption, we do not mean to imply that, in the absence of the issues discussed in this part, these statutes would compel elections officials to accept electronic signatures under Elections Code section 100. There may well be other reasons why Government Code section 16.5 and the UETA do not apply in these circumstances. For example, subdivision (b) of Government Code section 16.5 appears to condition the use of electronic signatures on the consent of the public entity, which was decidedly lacking here. It is also an open question whether the UETA would require a public entity to recognize an electronic signature since the UETA is also founded upon the consent of the parties to a transaction. (Civ. Code, § 1633.5, subd. (a).) Given the important role of elections officials in the petition process, they arguably

however, requires more than a signature. The voter must "personally affix" his or her signature to the petition and must then "personally affix" his or her printed name and address. Neither Government Code section 16.5 nor the UETA states that the use of an electronic signature is deemed to constitute "personally affix[ing]" it for purposes of Elections Code section 100. Further, both statutes are limited to electronic *signatures*. Neither authorizes the use of electronics to "affix" a printed name and address. Because Government Code section 16.5 and the UETA do not tell us whether electronic signatures are deemed to be personally affixed under Elections Code section 100, and because they do not address the use of printed information other than signatures, neither is sufficient to validate petitioner's use of the electronic signature software to endorse the marijuana initiative petition.

For essentially the same reason, the analysis of the Utah Supreme Court in *Anderson* is inapplicable to California's initiative petition practice. The statute considered in *Anderson* required certain candidates for statewide office to submit a petition or certification "signed" or "completed" by at least 1,000 registered voters. (*Anderson, supra,* 234 P.3d at pp. 1148, 1150.) The statute used the two terms interchangeably without defining them and did not impose any further constraints on signing. (*Id.* at p. 1150.) The court found that two different Utah statutes authorized the use of electronic signatures under these circumstances—a general statute defining the word "signature" to include " 'information stored in an electronic or other medium' " and a provision of the Utah UETA that is identical to our Civil Code section 1633.7, subdivision (d), mandating the acceptance of an electronic signature whenever a signature is required. (*Anderson,* at pp. 1152, 1153, 1155–1156.)

The Utah petition statute differs from Elections Code section 100 in two critical ways. Because the Utah statute requires only a signature, it does not contain section 100's additional requirement that the signature be personally affixed to the petition. Nor does it require that the voter personally affix his or her printed name and address. These differences preclude our adoption of *Anderson* as dispositive here.

C. *The Plain Meaning of the Statutory Language*

We therefore turn to the interpretation of Elections Code section 100. The critical interpretive issue is the one highlighted by the Secretary of State's

should be considered parties to the signature collection process. (See, e.g., 85 Ops.Cal.Atty.Gen. 191 (2002).) Further, an "electronic signature" as defined by these statutes appears to be any unique personal signifier, rather than the hand-drawn cursive script of one's name that is anticipated by Elections Code section 100. (See Gov. Code, § 16.5, subd. (d); Civ. Code, § 1633.2, subd. (h) [" 'Electronic signature' means an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record."].) We need not, and do not, resolve these issues.

original memorandum: whether the use of an electronic signature qualifies as "personally affix[ing]" the signature and other information for purposes of section 100.

Canons of statutory construction direct us to begin with the plain meaning of the contested terms. (E.g., *Pineda v. Bank of America, N.A., supra,* 50 Cal.4th at p. 1394.) The parties do not dispute the meaning of "personally," which prior cases have settled as meaning, in essence, "by the voter's own hand." Rather, they part ways on the meaning of "affix." A survey of dictionaries finds general agreement on three related but distinct meanings for the verb, summarized as follows: "1: to attach physically [¶] 2: to attach or add in any way <*affix* a signature to a document> [and] [¶] 3: to make by or as if by pressure <*affix* my seal>." (Merriam-Webster's Dict. of Law, at Dictionary.com <http://dictionary.reference.com/browse/affix> [as of June 30, 2011], boldface omitted.)

The County argues, in effect, for the first definition, construing the statute to require the endorser to write his or her signature and other information directly on a paper copy of the petition. In this way, the voter *physically* "attaches" the signature to the petition by inscribing it with a writing utensil. Use of a writing utensil is also the intuitive meaning of the phrase "affix . . . a signature."

While not as self-evident, petitioner's interpretation appears to fall within the more expansive second definition, "to attach or add in any way." In petitioner's interpretation of Elections Code section 100, the smartphone acts like an electronic pen and paper, allowing the voter to inscribe an electronic image of his or her signature and other information onto the electronic image of an initiative petition. These can be stored in a memory and, if need be, printed. In the process, the signature and other information are "affixed" to the printed petition. Although the signature is not inscribed *directly* by the hand of the voter onto the printed petition, the image on the printout is that of a handwritten signature, originally formed by the voter's own hand, and it can be evaluated by elections officials in the same manner as a directly inscribed signature.[7]

We find no merit in the County's argument that this interpretation should be rejected because it requires a voter merely to "trace[] his name and his street address . . . on a blank iPhone screen," thereby failing to satisfy the policies underlying the "personally affix" requirement. Contrary to the

---

[7] As the County acknowledges, it reviews an electronic photocopy of the voter registration records when validating registered voter signatures, rather than the actual signatures. Accordingly, it can hardly complain that an electronic copy of a voter's signature on the petition is inadequate for its purposes.

County's characterization of the procedure followed by petitioner, he did not merely trace his name on a smartphone screen. The evidence in the record demonstrates that petitioner actively sought out the marijuana initiative petition, reviewed it, and endorsed it according to the instructions provided online. As discussed in *Mapstead v. Anchundo*, it is important that an endorsing voter personally sign and provide address information because this conduct ensures the voter was actually involved in the endorsement, gave close attention to the matter, and consciously affirmed his or her continuing residence at the listed address. (*Mapstead v. Anchundo, supra,* 63 Cal.App.4th at p. 270.) For *Mapstead*'s purposes, tracing one's signature and address on the face of a smartphone in response to online instructions accompanying a copy of the petition requires the same conduct and provides the same degree of affirmation as writing one's signature and address on the page of a petition.

We find no reason to reject either of these definitions solely on the basis of the plain language of the statute. They plausibly fall within different, but equally accepted, definitions of the verb "affix," and both require the same degree of "personal" action on the part of the voter. Solely on these grounds, we have no basis for choosing between them.

D. *Other Interpretive Materials*

Because we find the plain language of the statute to be susceptible of both constructions, we turn to other interpretative materials to determine the intent of the Legislature. As noted above, " 'the court looks "to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." [Citation.] After considering these extrinsic aids, we "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute . . . ." ' " (*Lopez v. Superior Court, supra,* 50 Cal.4th at p. 1063.) We conclude these extrinsic materials weigh heavily in favor of the County's proposed construction.

It is most persuasive to us that the Legislature did not anticipate the use of electronic signatures when it drafted the statute and has since taken no action that can be construed as approving them for this purpose. When the Legislature first required voters personally to affix information to an initiative petition in 1933, electronic signatures were not even a twinkle in the eyes of Messrs. Hewlett and Packard. Necessarily, the legislators who enacted the language intended that voters would write directly on a paper copy of the petition, since there was no other means for a voter personally to affix

information to a petition. Further, the language of the statute is materially unchanged from its form in 1961, still long before the advent of electronic signatures.

 This is of overriding importance because, as the County and the Secretary of State argue, the decision to allow the use of this type of technology is properly one for the Legislature. Under our Constitution, the Legislature has the authority to "provide the manner in which petitions shall be circulated, presented, and certified, and measures submitted to the electors." (Cal. Const., art. II, § 10, subd. (e).) The use of electronic signatures in the endorsement of initiative petitions entails more than a new means for inscribing a signature. As described by petitioner, the process moves petition endorsement online, providing a means for endorsing petitions solely by use of an Internet Web site. Evaluating the policy issues arising from the use of the Internet for petition endorsement and accommodating this technology within the existing signature validation process is outside the proper scope of our task. Because there is no evidence the Legislature has ever considered these questions, let alone affirmatively approved the use of electronic signatures in connection with initiative petitions, we should hesitate to mandate their acceptance by judicial fiat.

Nor can it be assumed the Legislature would view the use of electronic signatures as a simple issue. In 1997, the Legislature passed Assembly Bill No. 44 (1997–1998 Reg. Sess.), which directed the Secretary of State to form a task force "to conduct a study on the creation of a digital electoral system." The system envisioned by the bill would, among other things, permit voters to use an electronic signature to "sign any petition." At a minimum, the passage of Assembly Bill No. 44 suggests the Legislature did not, at that time, view electronic signatures as encompassed within Elections Code section 100. It also suggests the Legislature approached the prospect with sufficient caution that it was unwilling to authorize the use of electronic signatures at that time; Assembly Bill No. 44 merely authorized a study of their use. This study appears never to have occurred, however, for the bill was vetoed by then Governor Wilson. In his veto message, the Governor asserted that the use of electronic signatures would "compromise voter confidentiality and generate significant opportunities for fraud. Since the digital system would be available only to those with access to computer terminals, it would not replace the current system. Accordingly, the use of two systems would complicate voter verification procedures, further compromising the electoral process." The caution of the Legislature and the concerns of the former Governor justify a similar caution on our part.

 Nonetheless, in finding the Legislature's failure to consider electronic signatures important, we do not mean to suggest it is conclusive. As

petitioner correctly argues in a section heading of his brief, "new technologies can comply with old statutes." Statutory interpretation must be prepared to accommodate technological innovation, if the technology is otherwise consistent with the statutory scheme. (See, e.g., *O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1461, 1464–1466 [44 Cal.Rptr.3d 72] [considering whether Web site blog could constitute a " 'periodical publication' " for purposes of the journalism shield law, even though "digital magazines" did not exist when the statute was enacted].) As discussed below, however, this particular technology is not entirely consistent with the present statutory scheme for the endorsement of initiative petitions because, at least as implemented here, electronic signature software deletes the circulator from the signature collection process. This inconsistency provides a second reason for rejecting petitioner's construction of the statute.

The Elections Code requires each petition submitted to county election officials to be accompanied by the declaration of the circulator, attesting to the genuineness of the signatures on the petition.[8] (Elec. Code, § 104.) While the code does not prescribe any particular method for obtaining signatures, the requirement of a circulator declaration indicates the Legislature anticipated they ordinarily would be gathered by a person soliciting voter signatures. Such solicitors, of course, have become a familiar feature of political meetings, mall sidewalks, and city street corners.

The contents of the declaration required from the circulator suggest the Legislature viewed the participation of the circulator as a protection against fraud in the collection of signatures. By requiring the circulator to certify that he or she witnessed each signing and believes the signatures to be genuine to the best of his or her information, the Legislature installed the circulator as a partial guarantor that the signatures were not the result of fraud. Although a circulator is not required to take active measures to prevent fraud, the circulator's declaration effectively certifies there was no obvious fraud and no nonobvious fraud of which the circulator was aware. Criminal prosecutions have been brought against circulators alleged to have certified falsely. (E.g., *People v. Guevara* (2004) 121 Cal.App.4th 17, 23 [16 Cal.Rptr.3d 738]; *People v. White* (1954) 122 Cal.App.2d 551, 552 [265 P.2d 115].)

Use of an electronic signature system bypasses this function of the circulator. Use of the software is innovative precisely because it will permit

---

[8] The requirement that statewide initiative petitions be submitted with a circulator's declaration attesting to the genuineness of the signatures appears to date from 1982, when Elections Code former section 44 was amended to include it (Stats. 1982, ch. 309, § 1, p. 977), but the idea is a century old. The same requirement had been applicable to county initiative petitions since the 1911 enactment of former Political Code section 4058. (Stats. 1911, ch. 342, § 1, p. 577.) The amendment to Elections Code former section 44 merely made the county requirement applicable to statewide initiatives.

voters to gain access to petitions from the Internet and execute them without the assistance or intervention of a circulator. Because the Elections Code requires the certification of a circulator for every petition, an electronic signer must also declare as his or her own circulator, as petitioner did. In reality, however, there is no circulator, at least not in the role envisioned by the statutory scheme. While the Elections Code does not appear to preclude a signer from serving as his or her own circulator (but see *Preserve Shorecliff Homeowners v. City of San Clemente* (2008) 158 Cal.App.4th 1427, 1452 [71 Cal.Rptr.3d 332] [declining to address argument that signers cannot act as their own collectors]), the practice eliminates from the signature collection system one of its primary protections against fraud, since the certification of an endorser that his or her own signature is genuine provides no more assurance of legitimacy than the signature itself. Illustrating the futility of the practice, petitioner appears to have used the same electronic signature to complete both the endorsement and the circulator's declaration.

▬ In interpreting the election laws, we must give "the utmost importance" to "ensuring the integrity of the electoral process and of interpreting and applying the applicable constitutional and statutory provisions in a manner that closely safeguards the integrity of that process." (*Costa v. Superior Court* (2006) 37 Cal.4th 986, 1012 [39 Cal.Rptr.3d 470, 128 P.3d 675].) To approve a system for signature collection that effectively eliminates circulators would appear to make the process more susceptible to fraud, potentially undercutting the integrity of the electoral process. Although digital signatures are generally said to be more secure than handwritten signatures, there is nothing in the record before us to suggest that Verafirma's petition signature software includes a means for ensuring that the person affixing a signature is actually the person whose signature purports to be affixed.

Even if such security exists, the Legislature, as the branch of government possessing the power under our Constitution to control "the manner in which petitions shall be circulated, presented, and certified" (Cal. Const., art. II, § 10, subd. (e)), is the proper body to determine whether and how to incorporate this technology, with its new risks and equal promise, into the process of initiative endorsement. Finding no indication the Legislature has yet considered that issue, let alone approved it, we would overstep the bounds of our proper role to walk into the breach.

▬ Because the electronic signature system is partially incompatible with the current statutory scheme for collecting petition signatures, and because the Legislature has not had an opportunity to consider the issues arising from this incompatibility, we decline to construe Elections Code section 100 to accommodate electronic signature software.

## III. DISPOSITION

The judgment of the trial court is affirmed.

Dondero, J., concurred.

**MARCHIANO, P. J.,** Concurring.—I concur in the result, but do not agree with the conclusion in part II.C. of the majority opinion. Elections Code section 100 in context with the other sections that govern what can and cannot be done in election matters means what it says. Plaintiff Michael Ni of Verafirma, which sells electronic signature software, wants this court to find that Verafirma's electronic signature tracing process is allowed by the Elections Code, but the plain meaning is to the contrary. Since 1915 the Legislature has mandated a personal signature on a petition and has not hinted that elections officers may use electronic signature tracing and submission of a thumb drive for comparison for accuracy. The plain meaning of the reiterations of the statute since 1915 does not allow for an interpretation of a virtual signing of a petition with an equivalent electronic signature.

A voter personally affixing his or her signature on the initiative petition has always been the hallmark of compliance. Elections Code section 100 began as former Political Code section 1083a and specified the qualifications for signing initiative petitions: "Wherever, by the Constitution or laws of this State, any initiative, referendum, recall or nominating petition or paper, . . . is required to be signed by qualified electors, only an elector who is a registered qualified elector at the time he signs such petition or paper, shall be entitled to sign the same. . . ." By 1931 section 1083a required the signer to add his place of residence, the precinct, and also "affix" the date of such signing. In 1939 section 1083a was amended to become section 45 of the Elections Code and provided that only a registered qualified voter was entitled to sign the petition or paper. "Each signer shall at the time of signing the petition or paper himself affix thereto his place of residence, giving street and number . . . . affix thereto the date of his signing." In 1994 with the reorganization of the Elections Code section 45 became section 100 and again provided that when an initiative is required to be signed by voters, only a person who is an eligible registered voter is entitled to sign it with an affixed signature. "Each signer shall at the time of signing the petition or paper personally affix his or her signature, printed name, and place of residence, giving street and number . . . ." (Former § 100.) Present section 100 sets forth an exemplar petition form directing the personal affixing of the signer's identifying information on spaces designated for the printed name, signature line, and residence address. Tracing an electronic signature is not the same as personally affixing one's signature on an initiative petition on the form required by section 100.

Elections Code section 9020 also sets forth the requirements for signing a petition, again requiring that each signer personally affix his or her signature, personally affix his or her printed name, and personally affix his or her address, among other requirements.

A reading of Elections Code section 100.5 suggests handwritten signatures only are permitted. Section 100.5 discusses a voter unable to personally affix on a petition the information required by Elections Code section 100 and allows another person to print the voter's name, but the voter "shall personally affix his or her mark or signature on the appropriate space of the petition."[1]

On the other hand, whenever the Legislature has considered the adaptation of modern technology to specific government affairs, it has circumscribed what is permitted, for example, in Government Code section 16.5 and Civil Code section 1633.1 et seq., and has done so after study, committee hearings, and input from concerned parties. Civil Code section 1633.3 carefully specifies the type of transactions that can use electronic records and electronic signatures, including facsimile signatures.[2] The use of digital signatures in

---

[1] Elections Code section 354.5 defines the requirements for a signature mark.

[2] Civil Code section 1633.3 provides:

"(a) Except as otherwise provided in subdivisions (b) and (c), this title applies to electronic records and electronic signatures relating to a transaction.

"(b) This title does not apply to transactions subject to the following laws: [¶] (1) A law governing the creation and execution of wills, codicils, or testamentary trusts. [¶] (2) Division 1 (commencing with Section 1101) of the Uniform Commercial Code, except Sections 1107 and 1206. [¶] (3) Divisions 3 (commencing with Section 3101), 4 (commencing with Section 4101), 5 (commencing with Section 5101), 8 (commencing with Section 8101), 9 (commencing with Section 9101), and 11 (commencing with Section 11101) of the Uniform Commercial Code. [¶] (4) A law that requires that specifically identifiable text or disclosures in a record or a portion of a record be separately signed, including initialed, from the record. However, this paragraph does not apply to Section 1677 or 1678 of this code or Section 1298 of the Code of Civil Procedure.

"(c) This title does not apply to any specific transaction described in Section 17511.5 of the Business and Professions Code, Section 56.11, 56.17, 798.14, 1133, or 1134 of, Sections 1350 to 1376, inclusive, of, Section 1689.6, 1689.7, or 1689.13 of, Chapter 2.5 (commencing with Section 1695) of Title 5 of Part 2 of Division 3 of, Section 1720, 1785.15, 1789.14, 1789.16, 1789.33, or 1793.23 of, Chapter 1 (commencing with Section 1801) of Title 2 of Part 4 of Division 3 of, Section 1861.24, 1862.5, 1917.712, 1917.713, 1950.5, 1950.6, 1983, 2924b, 2924c, 2924f, 2924i, 2924j, 2924.3, or 2937 of, Article 1.5 (commencing with Section 2945) of Chapter 2 of Title 14 of Part 4 of Division 3 of, Section 2954.5 or 2963 of, Chapter 2b (commencing with Section 2981) or 2d (commencing with Section 2985.7) of Title 14 of Part 4 of Division 3 of, or Section 3071.5 of, the Civil Code, subdivision (b) of Section 18608 or Section 22328 of the Financial Code, Section 1358.15, 1365, 1368.01, 1368.1, 1371, or 18035.5 of the Health and Safety Code, Section 662, 663, 664, 667.5, 673, 677, 678, 678.1, 786, 10086, 10113.7, 10127.7, 10127.9, 10127.10, 10197, 10199.44, 10199.46, 10235.16, 10235.40, 10509.4, 10509.7, 11624.09, or 11624.1 of the Insurance Code, Section 779.1, 10010.1, or 16482 of the Public Utilities Code, or Section 9975 or 11738 of the Vehicle Code. An

communications with the state is defined in Government Code section 16.5 and allows electronic signatures that conform to the Secretary of State's regulations.[3] By contrast, the Elections Code is not covered by those sections and does not have any similar sections.[4]

The use of modern technology in the initiative process has not been lost on the legislative process. In 2001 Walter Baer from the Public Policy Institute at the RAND Corporation prepared a policy evaluation of signing initiative petitions online for the Speaker's Commission on the California Initiative Process.[5] He discussed the benefit of increased participation in the initiative process from online signatures and the danger of fraudulent use and attendant cost. Baer suggested further work by the Secretary of State, the Legislature, and conducting field trials. In his followup monograph "Online

---

electronic record may not be substituted for any notice that is required to be sent pursuant to Section 1162 of the Code of Civil Procedure. Nothing in this subdivision shall be construed to prohibit the recordation of any document with a county recorder by electronic means.

"(d) This title applies to an electronic record or electronic signature otherwise excluded from the application of this title under subdivision (b) when used for a transaction subject to a law other than those specified in subdivision (b).

"(e) A transaction subject to this title is also subject to other applicable substantive law.

"(f) The exclusion of a transaction from the application of this title under subdivision (b) or (c) shall be construed only to exclude the transaction from the application of this title, but shall not be construed to prohibit the transaction from being conducted by electronic means if the transaction may be conducted by electronic means under any other applicable law."

[3] Government Code section 16.5 provides:

"(a) In any written communication with a public entity, as defined in Section 811.2, in which a signature is required or used, any party to the communication may affix a signature by use of a digital signature that complies with the requirements of this section. The use of a digital signature shall have the same force and effect as the use of a manual signature if and only if it embodies all of the following attributes: [¶] (1) It is unique to the person using it. [¶] (2) It is capable of verification. [¶] (3) It is under the sole control of the person using it. [¶] (4) It is linked to data in such a manner that if the data are changed, the digital signature is invalidated. [¶] (5) It conforms to regulations adopted by the Secretary of State. Initial regulations shall be adopted no later than January 1, 1997. In developing these regulations, the secretary shall seek the advice of public and private entities, including, but not limited to, the Department of Information Technology, the California Environmental Protection Agency, and the Department of General Services. Before the secretary adopts the regulations, he or she shall hold at least one public hearing to receive comments.

"(b) The use or acceptance of a digital signature shall be at the option of the parties. Nothing in this section shall require a public entity to use or permit the use of a digital signature."

[4] The Elections Code does reference the use of modern technology, Elections Code sections 355, 358 and 360 define software, vote tabulating devices, and voting devices for purposes of a voting system. None of the definitions in sections 300 to 362 consider electronic tracing of signatures for initiative petition signatures.

[5] Baer, Signing Initiative Petitions Online: Possibilities, Problems, and Prospects (Rand Corp. 2001) Document RP-931.

Signature Gathering" in 2008, he outlined how encrypted digital signatures could pave the way for a more representative initiative process.[6]

But significant policy considerations and implementation factors concerning usability and verifiable security still remain to be determined by the Legislature. Before the signature in a portable thumb drive can be validly recognized by an elections office, the Legislature would need to authorize such use by amending Elections Code section 100 and other related statutes. The plain meaning of Elections Code section 100 does not allow the court to legislate the use of Verafirma technology for the petition process. As it stands now, Elections Code section 100 in context means what it says and does not suggest that virtual electronic signatures are the legal equivalent of the required handwritten process of the Elections Code.

---

[6] Baer and Ulrich, Online Signature Gathering for California Initiatives (Center for Governmental Studies 2008).