Filed 6/27/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TIMOTHY J. TROTTER, as Trustee, etc.,<br><br>    Petitioner and Appellant,<br><br>    v.<br><br>WENDY TROTTER VAN DYCK,<br><br>    Objector and Respondent. | D081916<br><br><br>(Super. Ct. No. 37-2022-00031695-PR-TR-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Julia C. Kelety, Judge.  Affirmed.

Yale & Baumgarten and David W. Baumgarten for Appellant.

The Inheritance Recovery Attorneys and Edward Terzian for Respondent.

Timothy J. Trotter (Timothy), successor trustee of the Trotter Family Revocable Trust (Trust), petitioned the probate court seeking guidance about whether certain e-mails from his mother, Mary Trotter (Mary), constituted a valid amendment to the Trust's beneficiaries.  The court found that Mary's writings were insufficient to constitute an amendment to the Trust, and it ordered that the Trust be distributed to its original beneficiaries, including Wendy Trotter Van Dyck (Van Dyck).

Timothy contends on appeal that each of the various grounds upon which the probate court based its order was erroneous. We conclude that at least two of the grounds the court relied on were proper: (1) there was no signed document amending the Trust and the electronic signature provision of the Uniform Electronics Transaction Act (UETA) does not apply because a unilateral trust amendment does not constitute a "transaction" within the meaning of the statute (Civ. Code,[1] § 1633.2, subd. (o)); and (2) Mary's writings did not adequately express an intent to amend the trust by the writings themselves. Accordingly, we affirm the order without deciding Timothy's contentions as to the other grounds.

FACTUAL AND PROCEDURAL BACKGROUND

Jerry and Mary Trotter, who were married, established the Trust as a revocable trust in 2011, and named themselves collectively as both "Trustee" and "Trustors." The Trust names Timothy, their son, as the successor trustee in the event neither Jerry nor Mary can act as a trustee. The Trust also provides that upon the death of whichever spouse survives the other, certain stock is to be distributed to Timothy, and the rest of the trust estate should be distributed in equal shares to each of several children, including Jerry's daughter from another marriage, Van Dyck.

When Jerry died in 2012, Mary became the sole trustee. According to declarations in the record, Mary intended to exclude Van Dyck as a beneficiary because Van Dyck had already inherited from Jerry's previous wife, and Mary believed Van Dyck had "been fairly provided for" in 2015. In relevant part, the Trust authorized Mary to amend the Trust "by an

---

[1] Unless otherwise noted, further undesignated statutory references are to the Civil Code.

2

instrument in writing signed" by Mary and delivered to the "Trustee" – at the time, herself.

In late June 2020, Mary, Timothy, and Matthew Pribyl, Mary's estate planning attorney, exchanged e-mails about amending the Trust, excerpted below. On June 25, before her scheduled surgery on July 1, Mary e-mailed Timothy stating:

> "My mind is quite clear now as [to] how to move forward on the house and will.
>
> "I will write it out and then we need to see that the lawyer gets a copy asap and start redoing the will and trust.
>
> "1. The house will go to you
>
> "2. My cash assets will be divided among my five children; nothing to Wendy  [¶] . . . [¶]
>
> "The rest of selected items will be assigned to different children/grandchildren and I'm working on that list.
>
> "Thanks, mom"

The next day, on June 26, 2020, Timothy e-mailed Pribyl and copied Mary. He told Pribyl that Mary "want [*sic*] to make some updates on her personal stuff" and that they were "working on getting the financials all up to date . . . ." Timothy asked whether Pribyl was "available to meet on Zoom or phone to discuss."

Pribyl wrote in response: "Relative to any updates/amendments Mary wants to make to her Trust and/or companion estate planning documents, maybe we can schedule a phone conference either next week before the July 4th holiday, or that following week." Mary replied and told Pribyl that she would "be available to discuss the [Trust] and Will anytime on Monday or

3

Tuesday of next week and then after the [*sic*] July 4th.  [¶]  If you have questionnaires regarding the changes, please forward to me . . . .”

A few days later on June 29, 2020, Pribyl responded:

> “Attached to this message is my Questionnaire/Estate Plan Data Sheet that you can use to indicate the changes you want to make to your Trust, Will, Health Care and Asset Powers of Attorney, etc.

> “And I will have time tomorrow . . . if you want to discuss the changes by phone as well.

> “But if you want to review the Questionnaire in greater detail, and then schedule a time to talk next week, that works for me too.  I’ll be in my office every day during the week beginning Monday, July 6th, so you can let me know a day and time that would work best for your schedule.”

Mary replied later that day: “Working on the questionnaire and will email tonight or tomorrow morning.  We can decide then about what we may need to discuss.”

On June 30, 2020, Mary sent Pribyl a scanned copy of the questionnaire, which she completed by hand.  Her cover e-mail said that the “estate planning questionnaire” was attached and “[t]his is something you can review before we talk . . . .  Thanks, Mary[.]”  The questionnaire, entitled “Client Estate Plan Data Sheet,” included spaces for biographical information such as address, family members, personal property, bank information, and citizenship.  Under “Dispository Plan,” where the instructions say to “describe in detail” who should inherit her assets when she dies, Mary left that space blank.  On the following page, in the section for listing “CHILDREN AND GRANDCHILDREN,” Mary listed her children’s names from present and prior marriages, including Van Dyck.  Mary drew an asterisk next to Van Dyck’s name and drew another asterisk at the bottom of

4

the page with the words, "NO CONTACT – WOULD PREFER TO DROP FROM WILL – IF POSSIBLE[.]"  On the next page, she drew asterisks next to certain lines in the "Stocks and Mutual Funds" section, and noted next to another asterisk in the footer: "1 SHARE APPLE – FOR [beneficiary J.] – DISCUSS ACCT FOR [beneficiary J.] . . . ."

Mary underwent surgery the next day on July 1, 2020, and contracted an infection while in the hospital.  She suffered two heart attacks and passed away a few weeks after her surgery.  Timothy became the successor trustee, and when disputes arose about the administration of the Trust, Timothy petitioned the probate court for instructions.  He sought, among other things, guidance about "whether under the express terms of the Trust, [Van Dyck], by reason of Mary's writings, has been removed as a beneficiary of the [Trust]."  Pribyl signed a declaration included with the petition stating that Mary completed his firm's "standard form client Questionnaire regarding estate planning issues[,]" but she "was not able to sign a traditional amendment to the Trust."

After reviewing the writings, declarations, and the parties' briefs, the court issued an order first finding that Mary's e-mails and the questionnaire were instruments in writing delivered in accordance with section 7.02(b) of the Trust.  The court went on to find, however, that Mary did not "sign" her e-mails as the Trust requires, nor did she sign the questionnaire.  The court rejected Timothy's argument that she electronically signed the e-mails under the Uniform Electronic Transactions Act, which provides that in certain contexts, "[i]f a law requires a signature, an electronic signature satisfies the law."  (§ 1633.7, subd. (d).)  The court reasoned that the UETA, by its own terms, does not apply to "the creation and execution of wills, codicils, or testamentary trusts," which the court construed to include revocable living

5

trusts like the Trust.  (§ 1633.3, subd. (b)(1).)  The court also found the UETA inapplicable because a trust amendment does not constitute a transaction, and by its own terms, the UETA "applies only to a *transaction* between parties[,] each of which has agreed to conduct the transaction by electronic means."  (§ 1633.5, italics added.)

The probate court further concluded that Mary's writings were "not explicit as to the exclusion" of Van Dyck from the Trust, finding that Mary's note in the questionnaire that she "would prefer to drop" Van Dyck "if possible" was insufficient to effectuate an amendment, even if the questionnaire had been signed.  The court therefore instructed Timothy to distribute the Trust to the beneficiaries as set forth in the original document, which included Van Dyck.  Timothy timely appealed.

## DISCUSSION

Timothy argues on appeal that the probate court erred because: (1) the Trust is not a "testamentary trust" for purposes of the UETA exclusion; (2) amending a trust constitutes a "transaction," bringing it within the UETA's purview; (3) the questionnaire and Mary's June 25, 2020 e-mail were both "signed" under the UETA; and (4) Mary's writings were explicit enough to convey her intent to amend the Trust.  We conclude that the court did not err in finding that the trust amendment was not a transaction under the UETA, and that Mary's writings did not adequately express her intent to amend the Trust by the writings themselves.  Because each of those grounds forms a sufficient basis for affirming, we need not and do not decide Timothy's other contentions.

## I

We turn first to Timothy's argument that a trust amendment constitutes a transaction, bringing it within the UETA's purview.  We

6

consider the issue de novo. (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 189 ["The meaning and construction of a statute is a question of law, which we decide independently."].)

The parties do not dispute that unless Mary is deemed to have signed the writings electronically, the writings were not otherwise "signed" as required by the Trust. The UETA provides that in certain contexts, an electronic record satisfies the requirement that a record be in writing (§ 1633.7, subd. (c)), and an electronic signature satisfies the requirement that the writing be signed (§ 1633.7, subd. (d)). (See *J.B.B. Investment Partners, Ltd. v. Fair* (2014) 232 Cal.App.4th 974, 987–988; *Ni v. Slocum* (2011) 196 Cal.App.4th 1636, 1647 ["the Legislature has, through these provisions, expressed general approval of the use of electronic signatures in commercial and governmental transactions"].) Importantly, by its own terms, the UETA only applies "to a transaction between parties each of which has agreed to conduct the transaction by electronic means." (§ 1633.5, subd. (b).) The UETA defines "transaction" as "an action or set of actions occurring between two or more persons relating to the conduct of business, commercial, or governmental affairs." (§ 1633.2, subd. (o).)

Even though Mary was both the trustor and trustee when she sought to amend the Trust, Timothy argues that the amendment was a transaction and not a unilateral exercise because the Trust requires both execution by the trustor *and delivery* to the trustee. (Prob. Code, §§ 15402 & 15401, subd. (a)(2).) We disagree.

" 'The goal of statutory construction is to ascertain and effectuate the intent of the Legislature. [Citation.] Ordinarily, the words of the statute provide the most reliable indication of legislative intent. [Citation.] When the statutory language is ambiguous, the court may examine the context in

7

which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes. [Citations.] " 'Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.' " ' " (*Haggerty v. Thornton* (2021) 68 Cal.App.5th 1003, 1008.)

Assuming for the sake of argument that the phrase "two or more persons" can be fairly interpreted to include one person acting in two or more separate capacities, the context in which the language appears leads us to conclude that the purported trust amendment here would not constitute a transaction under the UETA. Both parties rely on commentary to the UETA from the National Conference of Commissioners on Uniform State Laws (also known as Uniform Law Commission or ULC), as did the probate court. We also consider the ULC's comments because when California adopted the UETA, the Legislature's intent was "to make uniform the law with respect to the subject of this title among states enacting it." (§ 1633.6(3).) According to those comments, the term "transaction" does not include "unilateral or non-transactional actions." (See Uniform Law Commission, Electronic Transactions Act (2021) <https://www.uniformlaws.org/viewdocument/final-act-21?CommunityKey=2c04b76c-2b7d-4399-977e-d5876ba7e034&tab=librarydocuments> [as of June 24, 2024], archived at <https://perma.cc/F2KD-TGY6>, UETA Final Act [downloadable PDF file], Comments to UETA, § 2, pp. 10–11, archived at <https://perma.cc/U9W9-NVU4>.) Importantly, after listing examples of what constitutes a transaction, the comments state that "[a] transaction must include interaction between two or more persons. Consequently, to the extent that the execution of a will, *trust*, or a health care power of attorney or similar health care designation does not involve another person and is a unilateral

8

act, it would not be covered by this Act" because it is "not occurring as a part of a transaction as defined in this Act." (UETA Final Act [downloadable PDF file], Comments to UETA, § 2, p. 11, italics added, archived at <https://perma.cc/U9W9-NVU4>.)

The ULC comments make clear that the purported trust amendment in this case falls in the category of unilateral acts excluded from the UETA. As sole trustor, Mary had a right to amend the Trust by a unilateral act. The mere delivery of such an amendment to the trustee (herself) would not constitute a "transaction between parties" within the meaning of the UETA. (§ 1633.5, subd. (b).) Even if the trustee were someone other than Mary, transmitting such a unilateral amendment to the trustee would not constitute a transaction "occurring between two or more persons relating to the conduct of business, commercial, or governmental affairs." (§ 1633.2, subd. (o).) Merely delivering a document to someone is no more of a "transaction" than sending someone a letter. Accordingly, we conclude that the UETA's electronic signature provisions do not apply to Mary's writings, and the probate court did not err in finding that neither the e-mails nor the attached questionnaire was properly "signed" to effectuate an amendment to the Trust.[2]

---

[2] Our Supreme Court recently decided *Haggerty v. Thornton* (2024) 15 Cal.5th 729 (*Haggerty*), holding that a trust may be modified using Probate Code section 15401 procedures for revocation "unless the trust instrument provides a method of modification and explicitly makes it exclusive, or otherwise expressly precludes the use of revocation procedures for modification." (See *Haggerty*, at p. 733.) *Haggerty* does not alter our conclusion here because, consistent with section 7.02(b) of the Trust, the statutory method of modifying a trust under Probate Code section 15401 also requires a signed writing. (See Prob. Code, § 15401, subd. (a)(2) [providing that a trust may be revoked by "a writing, other than a will, signed by the settlor or any other person holding the power of revocation and delivered to

9

## II

Although the lack of a proper signature is a sufficient ground to affirm, we also conclude that the probate court had another valid basis for its order: Mary's writings did not adequately express an intent to amend the trust by the writings themselves. "The interpretation of a written instrument, including a . . . declaration of trust, presents a question of law unless interpretation turns on the competence or credibility of extrinsic evidence or a conflict therein. Accordingly, a reviewing court is not bound by the lower court's interpretation but must independently construe the instrument at issue." (*Poag v. Winston* (1987) 195 Cal.App.3d 1161, 1173; see *Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 452–453.) Because the facts of the case are not in dispute, we review Mary's writings de novo.

Before discerning what a trustor or testator intended by the specific language in a purported trust or will document, as a general matter it must first "appear that [the] decedent intended to make a testamentary disposition *by that particular paper*, and if this cannot be shown it is immaterial that [her] testamentary intentions were . . . in conformity with it." (*Estate of Wong* (1995) 40 Cal.App.4th 1198, 1205.) In other words, before we examine the meaning of an instrument, we consider "the intention with which it was executed" or written (*Estate of Sargavak* (1950) 35 Cal.2d 93, 96) to determine whether the decedent intended that the trust be amended by the writing *itself*, and not some subsequent document (*Pena v. Dey* (2019) 39 Cal.App.5th 546, 554 (*Pena*) [no testamentary intent in decedent's written interlineations to trust document, or in an accompanying sticky note, because

_____

the trustee during the lifetime of the settlor or the person holding the power of revocation."].)

10

they were sent to his attorney with the intent to have the interlineations incorporated into a subsequent formal amendment to the trust]).[3]

Mary's writings do not show that she intended for her e-mails and the questionnaire to *themselves* make a disposition of her property. To establish such an intent, " 'it must satisfactorily appear that the maker of the instrument intended *by the very paper itself* to make a disposition' " of her property. (See *Estate of Beebee* (1953) 118 Cal.App.2d 851, 858.) Here, the language and context of the writings, both individually and considered together, demonstrate they were drafted in *anticipation* of a formal amendment. Mary's June 25, 2020 e-mail to Timothy stated that her mind was clear "as to how to *move forward* on the house and will[,]" that she would write it out, "and then [they would] need to see that the lawyer gets a copy asap [*sic*] and *start redoing* the will and trust." (Italics added.) She also stated that she was still "working" on a list of items to be assigned to different children and grandchildren. Although she expressed her desire to leave "nothing to [Van Dyck]," the e-mail as a whole indicates that Mary was only in the beginning stages of making a formal amendment to the Trust, and that she was planning to do so with Pribyl's assistance.

Even Timothy's e-mail to Pribyl the following day on June 26, 2020, reflected the anticipatory nature of Mary's intent. He wrote that she "want

---

3      Although Timothy asserts that cases requiring testamentary intent in the context of holographic wills are "legally incongruous" in the trust context, the same considerations underlie the requirement that a purported trust amendment—especially one which alters the disposition of property to take effect on a trustor's death—adequately expresses testamentary intent. (See *Pena, supra*, 39 Cal.App.5th at p. 554 ["If [decedent] intended the interlineations and signature on the . . . note to amend the trust by themselves, there would have been no need to have [his attorney] prepare the amendment for his signature."].)

11

[*sic*] to make some updates on her personal stuff[,]" noted that they were still "working on getting the financials all up to date[,]" and then asked whether Pribyl was "available to meet on Zoom or phone to discuss." His e-mail merely gave notice to Pribyl of Mary's desires and requested further discussion, which contradicts the idea that Mary intended the June 25, 2020 e-mail to serve as an amendment by itself. Pribyl responded: "Relative to any updates/amendments Mary wants to make to her Trust and/or companion estate planning documents, maybe we can schedule a phone conference . . . ." Pribyl's response shows that he, too, interpreted Timothy's e-mail as a request for further action, and that additional discussions would be necessary to formalize changes to the Trust.

Importantly, Mary's response to Pribyl further confirms this interpretation. She stated she was available both before and after the date of her scheduled surgery, then wrote: "If you have questionnaires regarding the changes, please forward to me at [Mary's e-mail address]." While it is unclear from the record whether this was Mary's first time attempting to amend the Trust, her request indicates she was aware of at least one intermediate step before effectuating a formal amendment: receiving and returning a questionnaire. At the very least, Mary anticipated speaking with Pribyl further and providing him with additional information, making it unlikely that Mary believed either the June 25, 2020 e-mail or the completed questionnaire would amend the Trust.

When Pribyl sent Mary the questionnaire, he instructed her to "indicate the changes you want to make" and informed her that they could schedule a time to talk "to review the Questionnaire in greater detail" if needed. This language also supports that the questionnaire was meant to aid in the process of amending the Trust, not to serve as an amendment itself.

12

Even the questionnaire's title, "Client Estate Plan Data Sheet," signals that it is used to communicate information from a client to her attorney for the purpose of estate planning. Mary apparently viewed the questionnaire that way, and not as the final step in the amendment process, because she wrote in both her June 29 and June 30, 2020 e-mails to Pribyl that they would have further discussions after the questionnaire was completed. If she believed that the questionnaire itself effectuated the amendment, there would be no need for further discussions.

The content of the questionnaire further supports that Mary lacked the intent for it to serve as a Trust amendment. Under "Dispository Plan" where the client is instructed to "describe in detail" who should inherit her assets when she dies, Mary left that space blank. Her handwritten note stating that she would "prefer" to drop Van Dyck from the will, "if possible," was written in the bottom margin of a page listing her children and grandchildren—not under "Dispository Plan," or in response to any question about changing the Trust's beneficiaries. She wrote a similar note about another beneficiary at the bottom of the following page, writing that she wanted to "discuss" an account for that beneficiary. The precatory nature of these handwritten notes supports the conclusion that Mary did not intend for the questionnaire to be a final amendment of the Trust.

Contrary to what Timothy argues, just because it was "possible" to exclude Van Dyck does not mean Mary intended for the questionnaire to serve as the amendment. And while Timothy contends that Mary's intended end result is clear, for the reasons discussed, he incorrectly presumes as a threshold matter that the e-mails and questionnaire sufficiently show Mary intended for *those* documents to effectuate the amendment. The intent of a trustor "must be ascertained from the whole of the trust instrument, not just

separate parts of it." (*Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168.) When viewed as a whole, Mary's writings appear to be nothing more than correspondence between a client and her attorney about potential changes to the Trust, with the expectation that her attorney would later formalize an amendment.

Accordingly, we affirm the order. Because we conclude that the probate court had two independently valid grounds for its order, we need not and do not resolve Timothy's other arguments.

DISPOSITION

The order is affirmed. Respondent is entitled to recover her costs on appeal.


BUCHANAN, J.

WE CONCUR:


DO, Acting P. J.


CASTILLO, J.

14