**Electronically Filed
Supreme Court
SCAP-19-0000854
01-FEB-2021
09:12 AM
Dkt. 47 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

TRACY YOSHIMURA, Plaintiff-Appellant,

vs.

KEITH KANESHIRO, Defendant-Appellee.

_____

SCAP-19-0000854

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-19-0000854; S.P. NO. 1SP181000465)

FEBRUARY 1, 2021

RECKTENWALD, C.J., McKENNA AND WILSON, JJ., AND EDDINS, J.,
IN PLACE OF NAKAYAMA, J., RECUSED, WITH CIRCUIT JUDGE ASHFORD,
ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

This appeal stems from the Circuit Court of the First

Circuit's[1] ("circuit court") dismissal, for lack of jurisdiction,

of Tracy Yoshimura's ("Yoshimura") petition to impeach Honolulu

_____

[1]    The Honorable Jeffrey P. Crabtree presided.

City Prosecutor Keith Kaneshiro ("Kaneshiro") under section 12-203 of the Revised Charter of the City and County of Honolulu (2017) ("section 12-203 of the Revised Charter"). That provision is titled "Impeachment of the Prosecuting Attorney," and it states as follows:

> The prosecuting attorney may be impeached for malfeasance, misfeasance or non-feasance in office. The courts of the State of Hawaii shall have jurisdiction as provided by applicable law over any proceeding for the removal of the prosecuting attorney who may be charged on any of the foregoing grounds. The charges shall be set forth in writing in a petition for impeachment signed by not less than five hundred duly registered voters of the city, and said signatures shall be necessary only for the purpose of filing the petition. The petition having once been filed, hearings shall be held on all such charges.

In December 2018, Yoshimura created an online petition to impeach Kaneshiro after Kaneshiro received a target letter from the United States Department of Justice. Yoshimura asserted his petition was supported by 800+ electronic signatures collected from an online platform called Change.org. In April 2019, Yoshimura filed a first amended petition purported to be electronically signed by 500+ signatories on a different online platform, DocuSign.

Between February and April 2019, Yoshimura sought the legal opinion of the City Clerk as to what information was necessary to certify that the signatories of his online petition(s) were duly registered voters of the City and County of Honolulu. In April 2019, Deputy Corporation Counsel Moana Yost ("Yost") set forth the City's position in a letter stating that impeachment

petition(s) must contain the full legible names, handwritten (not electronic) signatures, and residence addresses of at least 500 signatories.

Kaneshiro then moved to dismiss the petition, arguing that electronic signatures did not satisfy the requirements for a petition to impeach the city prosecutor under section 12-203 of the Revised Charter. Yoshimura then moved for leave to amend his petition to file a second amended impeachment petition, adding the City Clerk as a defendant, and seeking a declaratory order that the City must accept electronic signatures under Hawai'i Revised Statutes ("HRS") Chapter 489E (2008), Hawai'i's Uniform Electronic Transactions Act ("UETA"). Relevant to this appeal, HRS § 489E-7(d) (2008) states, "If a law requires a signature, an electronic signature satisfies the law." HRS § 489E-18(c) (2008), however, provides the UETA "does not require a governmental agency of this State to use or permit the use of electronic records or electronic signatures." HRS § 489E-18(a) (2008) also states "each governmental agency of this State shall determine whether, and the extent to which, it will send and accept electronic records and signatures to and from other persons . . . ."

Kaneshiro filed an opposition to Yoshimura's motion for leave to amend, which he combined with a cross-motion to strike the motion for leave to amend. The circuit court denied

Kaneshiro's motion to dismiss, because Yoshimura's motion for leave to amend was pending at that time.  At a later hearing on the motion for leave to amend (as well as Kaneshiro's cross-motion to strike the motion for leave to amend), however, the circuit court agreed with the City that signatories to an impeachment petition under section 12-203 of the Revised Charter must provide their full legible names, handwritten signatures, and residence addresses to enable the City Clerk to certify them as duly registered voters in the City and County of Honolulu and to protect the City's interest against fraud.  The circuit court denied Yoshimura's motion for leave to amend, concluding it would be futile, as Yoshimura insisted on providing only electronic signatures without residence addresses, to protect the privacy interest of signatories.  The circuit court also denied Kaneshiro's cross-motion to strike Yoshimura's motion for leave to amend.  The circuit court ultimately dismissed Yoshimura's first amended petition for lack of jurisdiction, because it did not meet the requirements of section 12-203 of the Revised Charter.

Yoshimura filed a motion for reconsideration, arguing that the City could not require handwritten signatures and residence addresses under section 12-203 of the Revised Charter without first engaging in rulemaking under HRS Chapter 91 (2008) (the Hawaiʻi Administrative Procedures Act, or "HAPA") or otherwise

setting forth its position in a written policy.  The circuit court denied the motion for reconsideration, concluding Yoshimura raised evidence and arguments that could have been raised earlier in the litigation, and that the motion lacked merit in any event.  The circuit court then entered its final judgment.

On appeal, Yoshimura argues that electronic signatures are valid under the law pursuant to HRS § 489E-7 (2008).  He also argues that, to the extent HRS § 489E-18 (2008) provides a government agency discretion to reject electronic signatures, the government agency must first promulgate rules under HAPA, or otherwise set forth a written policy, detailing the circumstances under which electronic signatures may be rejected.  Yoshimura argues the circuit court erred in concluding HRS § 489E-18 "trumped" HRS § 489E-7's general validation of electronic signatures.  He asserts the circuit court erred in dismissing his petition for lack of jurisdiction, denying his motion for leave to file a second amended petition, and denying his motion for reconsideration of those rulings.

Two months after oral argument in this case, Steven Alm was elected as City Prosecutor.  He was sworn into office in January 2021.  Kaneshiro thereafter moved to dismiss this appeal as moot.  As this case falls under the "public interest" exception to the mootness doctrine, we denied the motion to dismiss and

now proceed to address the merits of this appeal.  We hold that Hawaiʻi's UETA does not apply to the petitions for impeachment in this case, principally because application of the UETA requires the consent of the parties to transact governmental business electronically.  In this case, the City did not consent to be a party to a "transaction" between it and Yoshimura for the purpose of certifying whether petition signatories were duly registered voters of the City and County of Honolulu. Therefore, the City was not required, under the UETA, to have developed some form of written policy regarding the use and acceptance of electronic signatures.  We further hold that the City was not required, under HAPA, to have promulgated a rule concerning electronic signatures.  We therefore affirm the circuit court's final judgment.

## II.  Background

**A.  Petition for impeachment, Yoshimura's correspondence with Corporation Counsel and the Office of Elections, and first amended petition**

### 1.  Petition for impeachment

On December 18, 2018[2], the circuit court received Yoshimura's "Petition for Impeachment of Prosecuting Attorney Keith M. Kaneshiro Pursuant to Sec. 12-203 of the Honolulu City Charter etc[.]" ("petition for impeachment").  Yoshimura had

---

[2]    The petition for impeachment was filed December 20, 2018.

6

circulated an online petition on the platform Change.org alleging that Kaneshiro had committed malfeasance, misfeasance, or nonfeasance in office by failing to take appropriate action with respect to his deputy prosecutors, including Katherine Kealoha.[3]  At the time Yoshimura circulated his initial online petition, Kealoha had been indicted in federal court,[4] and Yoshimura believed two other deputy prosecutors had received subject letters.[5]  Yoshimura's online petition went on to state that Kaneshiro himself had received a target letter but failed to inform officials of the City and County of Honolulu and State of Hawai'i, choosing instead to remain on the job.  Yoshimura asserted that Kaneshiro's continued presence on the job would jeopardize the integrity of past and present criminal prosecutions.

Yoshimura attached an Excel spreadsheet listing the names, cities, states, and zip codes of 861 people represented to have electronically signed the Change.org online petition.  In a declaration appended to the petition for impeachment, Yoshimura "acknowledge[d] that some of the individuals that have signed the petition may NOT be duly registered voters in the City and

---

[3]    Yoshimura also named two additional deputy prosecutors he believed had received target letters.  One had not.

[4]    Kealoha has since been convicted and sentenced on federal charges.

[5]    See supra note 3.

County of Honolulu." There were alleged signatories identified as being from other counties in the State of Hawai'i, as well as from other states and countries. Additionally, while some signatories listed their city as somewhere within the City and County of Honolulu, they were identified only by their initials or by incomplete or false names (e.g., "J S," "Donald Duck," "1L").

2. **Yoshimura's correspondence with Corporation Counsel and the Office of Elections**

Sometime after filing the petition for impeachment, it appears Yoshimura became concerned about whether the City Clerk would certify the signatories as duly registered voters of the City and County of Honolulu. In February 2019, Yoshimura's counsel wrote to the City and County of Honolulu's Corporation Counsel Paul S. Aoki, acknowledging that the City Clerk's office "certif[ies] that individuals signing the petition are voters," and that "certification of the individuals who signed the petition . . . may be an issue." Although the Change.org petition collected only name, city, and zip code information, Yoshimura's counsel "propos[ed] to collect the following information from signatories: full name, last 4 digits of Social Security Number, and zip code of the person's residence address." Counsel explained that Yoshimura preferred to keep residence addresses of signatories private. Deputy Corporation

Counsel Yost responded that the City Clerk would await instructions, if any, from the circuit court from an upcoming status conference.

In March 2019, Yost wrote to Yoshimura's counsel to inform him that "[p]etitions that the City Clerk reviewed in the past to confirm voter registration have generally included the following information:  (1) date of signature; (2) signature; (3) printed name; and (4) residence address."  She also pointed out, "As you know, the City Clerk has not received or been instructed to certify or review any petition" in this case.  She repeated her intention to await instructions, if any, from the circuit court.

In April 2019, the parties and their attorneys, as well as Yost, met in person to discuss the City Clerk's certification process.  That meeting was memorialized in separate letters from Yoshimura's counsel and Yost, wherein the City's position was clear:  the City Clerk required signatories' residence addresses and would not accept electronic signatures.  In a memorandum in support of an April 2019 status conference, Kaneshiro informed the court that he supported and joined the City's position, as set forth in an April 18, 2019 letter from Yost.  The City formalized its opinion in an April 23, 2019 letter authored by Yost.  The City explained that the City Clerk checks residence addresses against the Statewide Voter Registration System to

9

confirm that the signatory is a duly registered voter of the city. The City explained that it also required handwritten signatures to "detect[] fraudulent or questionable signatures." The City cited to HRS § 489E-18(a) and (c) for the proposition that it is not required to permit the use of electronic signatures and can "determine whether, and the extent to which, it [would] accept . . . electronic signatures . . . and rely upon . . . electronic signatures." The City also stated in its letter that Yoshimura's petition had not been presented to the City Clerk for certification of voter registration status of the signatories to the online petition.

### 3. First amended petition

On April 12, 2019, Yoshimura filed his "First Amended Petition for Impeachment of Prosecuting Attorney Keith M. Kaneshiro Pursuant to Sec. 12-203 etc." ("first amended petition"). In the first amended petition, Yoshimura again acknowledged that not all signatories to his online petition were registered voters of the City and County of Honolulu. He stated that when he was "unable to obtain a formal legal opinion from the City Clerk or Corporation Counsel's office regarding the validity of electronic signatures, nor the information needed to verify those signatures as duly registered voters of the City and County of Honolulu," he sought the assistance of State Senator Maile M. Shimabukuro and Nedielyn Bueno, a "Voter

10

Services" employee of the State Office of Elections, to determine what information was necessary to verify the identity of a voter during the voter registration process. He attached an email string between Shimabukuro and Bueno as an exhibit. In the email string, Senator Shimabukuro wrote to Scott Nago, the director of the Office of Elections, on March 25, 2019, to ask "whether a voter's registration status can be verified via their first and last name, signature, last 4 digits of [their Social Security number], and zip code." She also asked whether a driver's license number could be used in lieu of the last four digits of a Social Security number.

Bueno responded the following day, stating that the registration status of a voter is verified using a Hawaiʻi driver's license number or Hawaiʻi state identification number (or, if none, the last four digits of an individual's Social Security number), along with name, date of birth, and residence address. She stated that a signature "is not used to verify voter registration status," but it is used to validate a voter's returned absentee ballot.

Senator Shimabukuro sent a follow-up email two days later relaying "a constituent's" question asking whether residence addresses were necessary to verify voter registration, given "issues such as identity theft and other personal 'safety' issues." Four days later, on April 1, 2019, Bueno responded by

stating that the information required to register to vote online is full name, date of birth, last four digits of a Social Security number, and driver's license or state identification number.  She clarified a day later that a paper voter registration must include the last four digits of a Social Security number only if the registrant does not have a driver's license or state identification number.  Thus, Bueno did not answer the voter registration verification question, instead listing what information was necessary for voter registration.[6]

Yoshimura represented in his first amended petition that, after receiving this information from Senator Shimabukuro and Bueno, he started "re-collecting" electronic signatures on DocuSign, a different online platform, asking signatories for their (1) full names; (2) birthdates; (3) last four digits of their Social Security number, driver's license number, or state identification number; and (4) zip code.

The content of the re-circulated petition was attached as another exhibit to the first amended petition.  The re-circulated petition clarified that one of the deputy prosecuting attorneys Yoshimura had named had not received a subject letter,

---

[6]    Yoshimura repeatedly represented throughout these proceedings and on appeal that Bueno told him verifying voter registration status required a signatory's full name, date of birth, last four digits of a Social Security number, and driver's license or state identification number.  As Kaneshiro and the City repeatedly counter-argued throughout these proceedings, Bueno was referring to the requirements for voter registration in the first instance.

contrary to Yoshimura's belief at the time he circulated his initial online petition.  The petition asked signatories to sign the following acknowledgement:  "I have read the attached Impeachment Petition, and hereby acknowledge by providing my signature and other pertinent information below, that I support the effort to Impeach Prosecutor Keith Kaneshiro, and do solemnly swear that I am a registered voter in the City and County of Honolulu."  Signatories were then instructed to enter the following information:  (1) full name, (2) Hawai'i driver's license number, or Hawai'i state identification card number, or last four digits of their Social Security number, (3) date of birth, (4) zip code, (5) date, and (6) signature.  The last page of the re-circulated online petition contained Yoshimura's full name, the last four digits of his Social Security number, his date of birth, his zip code, and his electronic signature (denoted by a frame around his name labeled "DocuSigned by:)."  Unlike the initial impeachment petition filed on December 20, 2018, which attached as an exhibit the Excel spreadsheet of the 861 signatories to the Change.org petition, the first amended petition did not attach as an exhibit any signatory information (other than Yoshimura's) from the re-circulated impeachment petition.

B.  **Motion to dismiss, opposition, and reply**

1.  **Kaneshiro's motion to dismiss**

In May 2019, Kaneshiro filed a "Motion to Dismiss First Amended Petition for Impeachment of Prosecuting Attorney etc." ("motion to dismiss").  He argued that no authority permitted the filing of the first amended petition where the initial petition was defective ab initio.  He contended Yoshimura's initial petition for impeachment was defective because the City Clerk had not certified that his petition contained 500 signatures of registered voters of the City and County of Honolulu prior to the filing of his impeachment petition, as required by section 12-203 of the Revised Charter.  Kaneshiro argued that Yoshimura should have dismissed the defective initial petition then re-filed an impeachment petition complying with section 12-203 of the Revised Charter.  For the same reason, Kaneshiro argued that the first amended petition must be dismissed for lack of subject matter jurisdiction or for failure to state a claim.  Kaneshiro included as an exhibit Yost's April 23, 2019 letter from the City to counsel and the court, advising that the City requires a handwritten signature and residence address to determine whether a signatory is a duly registered voter of the city, as required under section 12-203 of the Revised Charter.  Kaneshiro next pointed out that Yoshimura's

14

first amended petition was supported by just Yoshimura's signature.

### 2.  Yoshimura's memorandum in opposition to Kaneshiro's motion to dismiss

In his memorandum in opposition to Kaneshiro's motion to dismiss, Yoshimura newly argued that section 12-203 of the Revised Charter contains no requirement that the re-circulated impeachment petition's signatures "need to be certified by the [City] Clerk at any[]time during this Impeachment process," including before the petition is filed in circuit court.

As to whether amendment of an impeachment petition is permissible, Yoshimura argued that HRCP Rule 15(a)(1) (2012) permitted him to amend his impeachment petition once as a matter of course at any time before a responsive pleading is served, and the first amended petition was filed prior to any filings from Kaneshiro.

Lastly, Yoshimura argued the City must accept electronic signatures and cannot require residence addresses.  He stated that his initial Change.org petition was supported by at least 500 electronic signatures of duly registered Honolulu voters. He pointed to HRS § 489E-7(d), which states, "If a law requires a signature, an electronic signature satisfies the law."  As to the City's reliance on HRS § 489E-18 as authority to refuse to accept electronic signatures, Yoshimura argued the statute

15

required the City to have a pre-existing ordinance, charter provision, or written policy on acceptance or rejection of electronic signatures.  To Yoshimura, the City's April 23, 2019 letter setting forth its position that his impeachment petition must contain handwritten signatures "'electively' pick[ed] an unwritten policy out of the sky."

Yoshimura asked the circuit court to deny Kaneshiro's motion to dismiss.  He also requested that, if the circuit court found the form of his impeachment petition to be incorrect, he should be granted time to conform the petition.

### 3.  Kaneshiro's reply

In his reply memorandum, Kaneshiro argued that section 12-203 of the Revised Charter requires 500 signatures of "duly registered voters" of the City and County of Honolulu, which requires verification by the City Clerk, as a prerequisite to filing.  Kaneshiro also pointed out that Yoshimura sent numerous inquiries to the City asking what information the City Clerk would need to certify his petition, undercutting Yoshimura's belated argument that certification by the City Clerk is not necessary.

Kaneshiro next argued that the court and parties had always contemplated certification of the impeachment petition(s), consistent with Hawai'i law, specifically, based on this court's order in In the Matter of Impeachment of Honolulu City

16

Councilmember Rene Mansho, No. 24858 (2002). In the Mansho case, this court was presented with a petition to impeach a councilmember, pursuant to section 12-202 of the Revised Charter (1993). At that time, this court served as "a board of impeachment in any proceeding for the removal of a councilmember," upon presentation of a "charge . . . set forth in writing in a petition for impeachment signed by not less than one thousand duly registered voters of the council district for the removal of a council member, and said signatures shall be necessary only for the purpose of filing the petition." Upon receipt of the petition, this court filed an order stating that one "preliminary issue" was "whether the signatures in support of the petition are the signatures of registered voters in the Council District 1 of the City and County of Honolulu." This court ordered the petitioners to "submit a copy of the petition with its signature pages to the Clerk of the City and County of Honolulu. The Clerk of the City and County of Honolulu shall, within 90 days thereafter, review the signatures and submit a declaration concerning whether the petition contains at least one thousand signatures of duly registered voters from Council District 1 of the City and County of Honolulu."

Kaneshiro ended his reply memorandum urging the circuit court to dismiss Yoshimura's first amended petition for lack of jurisdiction, or for failure to state a claim, because the City

17

Clerk had not certified the petition(s), and the petition(s) on the record would not have been certified because they did not contain handwritten signatures and residence addresses, as the City stated the City Clerk would require under section 12-203 of the Revised Charter.

The circuit court held a hearing on the motion to dismiss on June 10, 2019 and denied the motion because Yoshimura had filed a motion for leave to amend (described in greater detail in the next section) that was still pending at that time.

C.    **Yoshimura's motion for leave to amend petition and Kaneshiro's opposition and cross-motion to strike**

Four days after Kaneshiro had filed his motion to dismiss, Yoshimura filed a "Motion for Leave to Amend Petition and to Name City Clerk as Respondent in a Declaratory Judgment Complaint" ("motion for leave to amend").  Yoshimura's counsel stated that he sought to name the City Clerk as a respondent to a declaratory judgment action, because the City had taken a position that the City Clerk would require signatories' residence addresses and not accept electronic signatures, when there was no pre-existing City policy stating the same. Yoshimura appended a proposed Second Amended Petition as an exhibit.  He sought a declaration from the court requiring the City Clerk to accept an impeachment petition with electronic signatures and without residence addresses of signatories.

Kaneshiro filed an "Opposition and Cross-Motion to Strike Petitioner's Motion for Leave to Amend Petition and to Name City Clerk as a Respondent in a Declaratory Judgment Complaint, Filed on May 6, 2019" ("opposition and cross-motion to strike").  In addition to reiterating the argument that the circuit court lacked jurisdiction (over the petition for impeachment, the first amended petition, and any motion for leave to amend to file a second amended petition for impeachment), Kaneshiro argued there was no authority for amending a petition for impeachment, adding a defendant, or combining a petition for impeachment with a complaint for declaratory judgment.

Yoshimura filed a "Memorandum in Opposition to Keith M. Kaneshiro's Cross-Motion to Strike Petitioner's Motion for Leave to Amend and to Name City Clerk as a Respondent in a Declaratory Judgment Complaint."  In it, he asserted that his re-circulated DocuSign petition did have over 500 signatures (but none were attached to the opposition or included in this record).

Kaneshiro filed a "Reply in Support of Cross-Motion to Strike Petitioner's Motion for Leave to Amend Petition and to Name City Clerk as a Respondent in a Declaratory Judgment Complaint, Filed on May 6, 2019," arguing that leave to amend should be denied based on futility, because the proposed second amended petition did not cure the jurisdictional defect of the prior amendment (because the petition(s) did not contain 500

signatures of duly registered Honolulu voters), and because Yoshimura's theory of declaratory relief (that HRS § 489E-7 requires the City Clerk to accept electronic signatures) is meritless, because HRS § 489E-18(a) and (c) provide the City with discretion to refuse to accept electronic signatures.

The circuit court held a hearing on the motion for leave to amend and the cross-motion to strike the motion for leave to amend on June 24, 2019.  At that hearing, Yoshimura acknowledged "that the proposed second amended petition relies 100 percent on the validity of electronic signatures," with respect to both the Change.org and DocuSign petitions.  He also acknowledged that there was no dispute "that the City is requiring wet signatures for this petition[.]"  He also conceded, "The second amended [petition] does not include residence addresses."

Yoshimura nevertheless went on to argue that the "City Council must determine" in writing, and ahead of time (not in response to an inquiry), whether to accept electronic signatures."  Without a written "across-the-board" policy, Yoshimura argued the City's position was ad hoc and "pull[ed] out of the sky."  By minute order, the circuit court denied Yoshimura's motion for leave to amend.  Its reasoning was set forth in its Findings of Fact, Conclusions of Law, and Order, summarized next.

## D.  Circuit court's findings of fact, conclusions of law, and order

On August 19, 2019, the circuit court filed its "Findings of Fact, Conclusions of Law, and Order (1) Denying Petitioner's Motion for Leave to Amend Petition and to Name City Clerk as a Respondent in a Declaratory Judgment Complaint, Filed May 6, 2019; (2) Denying Respondent Keith M. Kaneshiro's Cross-Motion to Strike Petitioner's Motion for Leave to Amend Petition and to Name City Clerk as a Respondent in a Declaratory Judgment Complaint, Filed on May 17, 2019; and (3) Dismissing Case for Lack of Jurisdiction."  Among the findings of fact ("FOFs") and conclusions of law ("COLs") relevant to this appeal, the circuit court stated the following:

> [FOF]4.  Regardless of the exact form of the actual or proposed petition(s), the court finds at no point in this case did Petitioner submit 500 "wet" hand-written signatures along with reasonably verifiable information on whether the "signers" were currently duly registered voters in the City & County of Honolulu.
>
> [FOF]5.  The court finds there is no way to tell based on the record in this case whether the actual or proposed "digital signers" of the petitioner(s), were all different people, and whether they were all duly registered voters of the city of Honolulu at the time they "signed" electronically.
>
> [FOF]6.  The parties agreed on the record that on behalf of the City, the Department of the Corporation Counsel issued its written position in a letter dated April 23, 2019, signed by Deputy Corporation Counsel Moana Yost.  The letter is an exhibit in the record.  The City's position is that digital signatures are not acceptable for the actual or proposed petition(s) to impeach Mr. Kaneshiro.  More specifically, the City's reason (as stated in its 4/23/19 letter) for not allowing digital signatures is the City's interest in detecting fraudulent or questionable signatures.  In order to determine the (required) voter registration status, the City is requiring a) the signer's

21

full legible name; b) a hand-written signature; and c) residence address (presumably to determine if the signer is currently a resident of the City of Honolulu, as opposed to when they last registered to vote or last updated their address in the voter rol[l]s).

[COL]7.  The court concludes the language of Section 12-203 means the petition to impeach Mr. Kaneshiro must have the required 500 signatures of duly registered voters of Honolulu County when the petition is filed.  Because no actual or proposed petition for impeachment in this case was or would be signed by 500 duly[]registered voters in the City, the actual and proposed petition(s) did not satisfy the requirements of City Charter section 12-203.

[COL]8.  The court finds and concludes it is not unreasonable or discriminatory for the City to take the position that fraudulent or questionable signatures are a valid concern for online petitions to impeach duly elected public officials. See Perotka v[.] Cron[i]n, 117 Haw[ai'i] 323 (2008).

[COL]9.  Petitioner argues the City must accept digital signatures pursuant to HRS [§] 489E-7, which among other things provides that if a law requires a signature, an electronic signature satisfies the law.  Per the same 4/23/19 letter from Corporation Counsel, the City's position is that it is not required to accept digital signatures for impeachment petitions, because HRS [§] 489E-18(c) gives it the discretion to allow or not allow digital signatures.  The court concludes this discretionary "carve out" in 489E-18(c) expressly applies to government entities, so in essence HRS [§] 489E-18(c) can trump HRS [§] 489E-7 when a government entity is involved.

[COL]10.  In view of HRS [§] 489E-18(c), and given the City's concern with both a) handwritten versus electronic signatures, and b) ability to verify a signature is from a duly registered voter, the court respectfully rejects Petitioner's argument that the City must accept digital signatures without residential addresses for impeachment petitions pursuant to HRS [§] 489E-7.

[COL]11.  Petitioner also argued that the City must formally adopt its position, by rule or other official enactment, that it will not accept digital signatures for impeachment petitions.  The parties agreed on record that the City's position is as expressly stated in Corporation Counsel's 4/23/19 letter which is part of the record.  The court is not aware of any legal requirement that the City's position on this finite issue must be formally enacted in order to be effective, and therefore declines to adopt Petitioner's position.

[COL]12.  Respondent argued in his motion to strike that since the original petition was defective, the court never had jurisdiction to even consider the first amended petition or the second (proposed) amended petition.  The court respectfully disagrees.  As with the court's ruling on Respondent's motion to dismiss, the court concludes it has jurisdiction to rule on the First Amended Petition and the Proposed Second Amended Petition.  The court's reasoning is that applying a policy of "once defective, always defective, and petitioner must file a new petition with a new lawsuit" does not comport with modern rules of civil procedure which permit amendment of even jurisdictionally defective pleadings if the proposed amendment is not futile.  This issue was not discussed in the pre-statehood cases cited by Respondent, and so those cases are non-binding on the particular issue presented here.

[COL]13.  Here, the proposed Second Amended Petition has the same defects as the two earlier petitions as described above.  Since the court concludes the City has the discretion to reject the electronic signatures in this case, and since the proposed Second Amended Petition suffers from the same defects as the prior petitions, the court therefore concludes the proposed petition is futile, and the motion to amend is therefore denied.

[COL]14.  Since there is no valid petition for impeachment before the court that complies with Section 12-203 of the city charter, as determined by the City's discretionary and valid requirements regarding actual signatures from demonstrably duly registered voters, the court hereby dismisses this case for lack of jurisdiction.

The circuit court then denied Yoshimura's motion for leave to amend his petition to name the City Clerk as a respondent in a declaratory judgment complaint, denied Kaneshiro's cross-motion to strike Yoshimura's motion for leave to amend, and dismissed this case for lack of jurisdiction.

**E.  Yoshimura's motion for reconsideration and the circuit court's order of denial**

Yoshimura then filed a motion for reconsideration.  He argued that the federal Electronic Signatures in Global and National Commerce Act (the "ESIGN Act," 15 U.S.C. § 7001 et

23

seq.) was an additional authority requiring the City to determine the extent to which it will accept electronic signatures on impeachment petitions.[7]

Yoshimura next argued that the City was required to promulgate a rule under HAPA (HRS chapter 91) as to when it would accept or reject electronic signatures on impeachment petitions. He noted that HRS § 91-1 (2008) defines "rule" as an "agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency," but excludes the "internal management" of an agency. He went on to cite Application of Terminal Transportation, Inc., 54 Haw. 134, 504 P.2d 1214 (1972), for the proposition that, "in the absence of clear legislative direction to the contrary, the court will not interpret HAPA so as to give government even the appearance of being arbitrary or capricious." He stated that the City's ad hoc decision not to accept electronic signatures on his impeachment petition was arbitrary.

---

[7] The Federal ESIGN Act does not apply in this case. 15 U.S.C. § 7001(a)(1) states, "Notwithstanding any statute, regulation, or other rule of law (other than this subchapter and subchapter II), with respect to any transaction in or affecting interstate or foreign commerce -- (1) a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form . . . ." (Emphasis added). The impeachment of a City prosecutor does not affect interstate or foreign commerce. Therefore, this opinion does not further discuss the ESIGN Act.

Yoshimura next argued that leave to amend a petition should have been "freely given," citing Keawe v. Hawaiian Electric Company, 65 Haw. 232, 649 P.2d 1149 (1982), absent any apparent or declared reason, such as undue delay, bad faith, or dilatory motive on the part of the movant, or a repeated failure to cure deficiencies in the complaint.

Lastly, Yoshimura cited Anderson v. Bell, 234 P.3d 1147 (Utah 2010), as a case in which electronic signatures were accepted on a petition to qualify a candidate for an election. He concluded by asking the circuit court to grant his motion for reconsideration, vacate its dismissal order, require the City to accept electronic signatures and to certify his petition, and allow him to file his second amended petition.

In his memorandum in opposition to Yoshimura's motion for reconsideration, Kaneshiro argued that three independent reasons supported denying Yoshimura's motion for reconsideration. First, the circuit court's jurisdiction was never triggered because Yoshimura never presented it with a petition signed by over 500 duly registered Honolulu voters.  Second, Yoshimura's motion for reconsideration did not meet the requirements of HRCP Rule 59(e) (2000), which permits reconsideration of a court's order where the parties "present new evidence or arguments that could not have been presented earlier."  For example, Kaneshiro argued that Yoshimura's HAPA argument was impermissibly raised

for the first time in his motion for reconsideration.  Third, Kaneshiro stated Yoshimura's arguments were meritless in any event.

Lastly, Kaneshiro distinguished the Anderson case as involving a state statute that required acceptance of electronic signatures.  He also pointed out that Anderson was an election nomination proceeding, and Utah liberally construes its election statutes.

In Yoshimura's reply, he asserted he did have 500 signatures on his petition (referring to the initial Change.org petition, which he represented he "never abandoned"), and that the issue was whether the City Clerk would accept electronic signatures.  Yoshimura asked the court to reconsider its order and allow him to "submit a Second Amended Petition which will be supported by at least 500 electronic signatures."

On October 2, 2019, the circuit court denied Yoshimura's motion for reconsideration.  The court's order stated it "still does not have jurisdiction" over the petition and that "everything argued in the Motion [for reconsideration] was or could have been raised earlier."  Nevertheless, the court concluded that, on the merits, it remained unpersuaded.

**F. Notice of appeal**

On November 15, 2019, the circuit court entered its final judgment. Yoshimura timely appealed. This court granted transfer of the appeal on April 6, 2020.

### III. Standards of Review

**A. Interpretation of the Revised Charter of the City and County of Honolulu and the Hawai'i Revised Statutes**

Statutory interpretation is a question of law reviewable de novo. This court's statutory construction is guided by established rules:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.
> When interpreting a municipal ordinance, this court applies the same rules of construction applied to statutes.

Rees v. Carlisle, 113 Hawai'i 446, 452, 153 P.3d 1131, 1137 (2007) (citations omitted).

**B. Conclusions of law**

"[T]he standard of review applicable to the circuit court's conclusions of law is the right/wrong standard." Mehau v. Reed, 76 Hawai'i 101, 107, 869 P.2d 1320, 1326 (1994).

## C.  Motion for leave to amend

"The grant or denial or leave to amend under Rule 15(a) is within the discretion of the trial court and is subject to reversal on appeal only for an abuse of discretion."  Bishop Trust Co. v. Kamokila Dev. Corp., 57 Haw. 330, 337, 555 P.2d 1193, 1198 (1976).

## D.  Motion for reconsideration

"HRCP Rule 59(e) motions for reconsideration are reviewed under the abuse of discretion standard.  The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant."  Kaneohe Bay Cruises, Inc. v. Hirata, 75 Hawai'i 250, 258, 861 P.2d 1, 6 (1993) (citation omitted).

## IV.  Discussion

We first address Kaneshiro's motion to dismiss filed after his successor was sworn in on January 2, 2021.  Kaneshiro asserts this case must be dismissed on the basis of mootness. As we preliminarily explain, based on the public interest exception to the mootness doctrine, we address the merits of the issues raised on appeal.

In his opening brief, Yoshimura argues broadly that electronic signatures are "an important component of direct democracy" in the digital age.  He notes there are only three

other cases nationwide analyzing the use of electronic signatures to effect direct democracy:  <u>Anderson</u>, 234 P.3d 1147; <u>Benjamin v. Walker</u>, No. 16-0228 (W.Va. Apr. 19, 2020); and <u>Ni v. Slocum</u>, 196 Cal. App. 4th 1636 (Cal. App. 1st Dist. 2011).  This case would be the fourth.

Yoshimura raises the following points of error on appeal:

> A.  [The circuit court] erred when [it] found, in Conclusion of Law #9, that:  "489E-18(c) expressly applies to government entities, and can trump HRS [§] 489E-7 when a government entity is involved," because HRS § 489E-18(a) requires that each governmental agency determine whether, and the extent to which, it will send and accept electronic records and electronic signatures, and the City failed to make such a determination pursuant to and/or in compliance with the requirements mandated by Chapter 91, the Hawaii Administrative Procedures Act.
>
> . . . .
>
> B.  [The circuit court] erred when [it] found, in Conclusion of Law #10, that:  "In view of HRS [§] 489E-18(c), and given the City's concern with both a) handwritten versus electronic signatures, and b) ability to verify a signature is from a duly registered voter, the court respectfully rejects Petitioner's argument that the City must accept digital signatures without residential addresses for impeachment petitions pursuant to HRS [§] 489E-7."
>
> . . . .
>
> C.  [The circuit court] erred when [it] found, in Conclusion of Law #11, that:  "Petitioner also argued that the City must formally adopt its position, by rule or other official enactment, that it will not accept digital signatures for impeachment petitions. . . .  The court is not aware of any legal requirement that the City's position on this finite issue must be formally enacted in order to be effective, and therefore declines to adopt Petitioner's petition."
>
> . . . .
>
> D.  [The circuit court] erred when [it] found, in Conclusion of Law #13, that:  "Since the court concludes the City has the discretion to reject the electronic signatures in this case, and since the proposed Second Amended Petition suffers from the same defects as the prior

29

> petitions, the court therefore concludes the proposed
> petition is futile, and the motion to amend is therefore
> denied."
>
> . . . .
>
> E. [The circuit court] erred when [it] denied Mr.
> Yoshimura's motion for reconsideration which asserted: (A)
> that the Court erred in focusing on HRS § 489E-18(c), which
> should have been read together with the entirety of Chapter
> 489E, because § 489E-18(a) requires each governmental
> agency of this State to determine whether, and . . . the
> extent to which, it will send and accept electronic records
> and signatures; (B) the federal ESIGN Act mandates that a
> state make a determination under what circumstances it
> would accept electronic signatures and thus any such
> exception to the acceptance of electronic signatures must
> be set forth in writing, (C) the City is required, by
> Chapter 91 of the Hawaii Revised Statutes (the Hawaii
> Administrative Procedures Act, "HAPA"), to make this
> determination in a manner consistent with the rulemaking
> provisions of the HAPA; and (D) as the City has failed to
> adopt rules in a manner that is in compliance with
> guidelines and requirements set forth in HAPA and
> § 489E-18(a) to determine whether, and the extent to which,
> it will send and accept electronic records and electronic
> signatures, the City is prohibited from asserting that it
> is not required to use or permit the use of electronic
> records or signatures.

Yoshimura's first three points of error can be combined as challenging the circuit court's conclusion that, under HRS § 489E-18, the City has the discretion to refuse to accept electronic signatures unaccompanied by residence addresses, without first promulgating a written policy, by rulemaking under HAPA or otherwise. Yoshimura's next point of error is that the circuit court abused its discretion by denying his motion for leave to amend. Yoshimura's last point of error is that the circuit court abused its discretion in denying his motion for reconsideration. Each issue will be discussed in turn below.

## A.   The public interest exception to the mootness doctrine applies

After his successor was sworn in, Kaneshiro filed a motion to dismiss this case on the basis of mootness.  Kaneshiro points out that Yoshimura seeks impeachment or removal of Kaneshiro from office and that as he no longer holds office, the matter is moot.

As explained in In re Application of Maui Electric Company, Ltd., 141 Hawai'i 249, 408 P.3d 1 (2017), however, there is a "public interest" exception to the mootness doctrine.  "This court reviews three factors in analyzing the public interest exception:  (1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for future guidance of public officers, and (3) the likelihood of future recurrence of the question."  141 Hawai'i at 256-57, 408 P.3d at 8-9 (internal quotation marks and citations omitted.[8]

This situation triggers the public interest exception, as (1) there is a public interest in addressing procedures

---

[8]   This court has rejected the notion that the "public interest" exception is part of, or indistinguishable from, the "capable of repetition yet evading review" exception to the mootness doctrine.  See, e.g., Moana v. Wong, 141 Hawai'i 100, 107 n.9, 405 P.3d 536, 543 n. 9 (2017) ("Although the 'capable of repetition, yet evading review' exception has 'merged at times' with the similar public interest exception to the mootness doctrine, 'they are, in fact, "separate and distinct."'"); Doe v. Doe, 116 Hawai'i 323, 327 n.4, 172 P.3d 1067, 1071 n.4 (2007) (same); Kaho'ohanohano v. State, 114 Hawai'i 302, 333 n.23, 162 P.3d 696, 727 n.23 (2007) (same).

applicable to impeachment of public officials; (2) determination of issues raised in this case would assist public officers in the future; and (3) the issues raised in this case are likely to recur.

Thus, although the matter of Kaneshiro's impeachment is now moot, the public interest exception to the mootness doctrine applies, and we address the merits of the issues on appeal.

**B.  The City can require handwritten signatures and residence addresses in order to certify signatories on an impeachment petition under section 12-203 of the Revised Charter**

**1.  Arguments on appeal**

**a.  Yoshimura's opening brief**

Yoshimura argues that the circuit court erred in finding that HRS § 489E-18(c), which "does not require a governmental agency of this State to use or permit the use of electronic records or electronic signatures," can "trump" HRS § 489E-7, which states that electronic signatures generally satisfy the law.  He maintains the circuit court failed to read HRS chapter 489E in its entirety.  Specifically, he points to HRS § 489E-18(a) to argue that the City was required to determine whether and to what extent it will accept electronic records and signatures.  HRS § 489E-18 is titled "Acceptance and distribution of electronic records by governmental agencies." Subsection (a) provides the following:

> Except as otherwise provided in section 489E-12(f), each governmental agency of this State shall determine whether, and the extent to which, it will send and accept electronic records and electronic signatures to and from other persons and otherwise create, generate, communicate, store, process, use, and rely upon electronic records and electronic signatures.

Yoshimura contends the circuit court failed to consider the Anderson case, in which the Utah Supreme Court held that the Lieutenant Governor was required to accept electronic signatures on a certificate of nomination, under Utah's UETA, which is similar to Hawaiʻi's.  He urges this court to follow the Anderson court's reasoning.

Yoshimura next asserts the City could have fulfilled HRS § 489E-18(a)'s requirements by promulgating a written policy to avoid an arbitrary or capricious decision on accepting or rejecting electronic signatures.  Yoshimura argues this could have been accomplished through rulemaking under HAPA.

Yoshimura next argues the circuit court erred in accepting the City's fraud-prevention rationale to require an impeachment petition to contain signatories' handwritten signatures and residence addresses.  He states the City's "'concern' of 'fraud' is absurd given the existence of the ESIGN Act, and the acceptance of electronic signatures throughout the United States."  He again cites to the Anderson case, this time for the proposition that electronic signatures "may be a better deterrent to candidate fraud because an electronic signature

incorporates readily identifiable personal, but not-public, information."  Anderson, 234 P.3d at 1155 n.7.  In this case, Yoshimura posits, a signatory could be confirmed to be a duly registered Honolulu voter using the information provided on the DocuSign petition (full name, date of birth, last four digits of Social Security number or driver's license number or state ID number, and zip code).

### b.  Kaneshiro's answering brief

Kaneshiro argues the circuit court did not err in dismissing Yoshimura's first amended petition, because "(1) the City Clerk never certified any of [Yoshimura's] petitions for impeachment; (2) the City Clerk has the discretion to reject electronic signatures in support of impeachment petitions; and (3) the City Clerk may require residence addresses to certify a signatory's eligibility to vote on City matters."

Kaneshiro first argues that the requirements of section 12-203 of the Revised Charter (that an impeachment petition is supported by 500 signatories) are jurisdictional and subject to strict construction, again citing the Mansho order.  He argues the City Clerk is responsible under section 3-301 (2017) of the Revised Charter and HRS § 11-14 (2008 & Supp. 2012) for reviewing and certifying impeachment petitions.  Kaneshiro points out Yoshimura never presented any petition to the City Clerk for certification of signatures.  This omission, he says,

is fatal, and the circuit court did not err in dismissing his petition.

Kaneshiro goes on to argue that, even if the petition(s) had been presented to the City Clerk for certification, the petition(s) would not have been certified, because neither contained the information necessary to confirm data stored in the State Voter Registration System: (1) full legible names; (2) handwritten signatures; or (3) residence addresses. In fact, Kaneshiro argues, only Yoshimura's signature supported the DocuSign petition.

Kaneshiro next argues that the City is not required to accept electronic signatures in support of a petition for impeachment under the plain language and legislative history of Hawai'i's UETA. He quotes HRS § 489E-18(c), which provides that Hawai'i's UETA "does not require a governmental agency of this State to use or permit the use of electronic records or electronic signatures." He states the legislative history of Hawai'i's UETA, as well as the National Conference of Commissioners on Uniform State Laws ("NCCUSL") commentary to the model UETA, both state that "the UETA is permissive and does not mandate governmental use of electronic signatures." This is especially so where the parties (here, the City) have not agreed to be part of an electronic transaction.

35

Further, Kaneshiro argues the City Clerk's determination does not require rulemaking under HAPA, because the decision to reject electronic signatures is "merely a reiteration or clarification of existing law, both state election law and county impeachment law." He also notes that the legislature knows how to mandate further rulemaking in its statutes by expressly cross-referencing HAPA. He argues that the legislature would have similarly cross-referenced HAPA in HRS § 489E-18 if governmental agencies were required to create rules as to when they would accept or not accept electronic signatures. The fact that the legislature did not, Kaneshiro states, distinguishes this case from Anderson, the case upon which Yoshimura heavily relies. According to Kaneshiro, the Utah UETA interpreted in Anderson required state governmental agencies to promulgate rules to identify which transactions could be conducted by electronic means, and which transactions would never be conducted by electronic means. For that reason, the Lieutenant Governor in Anderson was not authorized to reject electronic signatures on a nomination petition in the absence of rules. Kaneshiro footnotes that the Utah legislature promptly overrode the Anderson opinion by amending the Utah UETA to require handwritten signatures on petitions. See Utah Code Ann. § 20A-9-502.

36

Kaneshiro points out that, as a matter of logic, Yoshimura's rulemaking argument fails, because the City would have been in violation of HAPA had it informally decided in this case that it would accept electronic signatures on impeachment petitions.

As to whether signatories' residence addresses are required on the impeachment petition, Kaneshiro quoted Nader v. Cronin, Civ. No. 04-00611 ACK-LEK, 2008 WL 1932284, at \*27-29 (D. Haw. May 1, 2008), for the proposition that "providing one's residence address is the linchpin of being properly registered."

### c.  Yoshimura's reply brief

In his reply brief, Yoshimura maintains the UETA applies to his impeachment petition because the transaction at issue is not between him and the City Clerk; rather it "is between Mr. Yoshimura, as the circulator of the petition, and the voter desiring to impeach Mr. Kaneshiro."  Applying the UETA to his petition, he argues the plain language of HRS § 489E-7(d) ("If a law requires a signature, an electronic signature satisfies the law") reflects the legislature's "intent . . . to accept, NOT reject, electronic signatures."  He also argues Kaneshiro and the circuit court "ignored" the plain, mandatory language of HRS § 489E-18(a), that "each governmental agency of this State shall determine whether, and the extent to which, it will send and accept electronic records and electronic signatures . . . ."

37

Yoshimura also states that the "underlying issue here, is that there is very little guidance in the City Charter provision on what is required for an impeachment petition." For example, he reads the Mansho order as permitting an impeachment petition to be filed with a court, with that court further ordering the petition to be submitted to the City Clerk for certification.

### d. City's brief of amicus curiae

Before this case was transferred from the ICA, the ICA granted the City's motion for leave to file a brief of amicus curiae. The City's amicus brief focuses solely on the issue of whether the City Clerk can require handwritten signatures, accompanied by residence addresses, on a petition for impeachment under section 12-203 of the Revised Charter without first promulgating a rule or other prior written policy. The City argued that the UETA does not apply to Yoshimura's petition, because the City did not consent to be a party to this electronic transaction, and HRS § 489E-5(b) (2008) states that Hawai'i's UETA "appl[ies] only to transactions between parties each of which has agreed to conduct transactions by electronic means." The City points to the state legislative history and the NCCUSL commentary to the model UETA for the proposition that governmental agencies' acceptance of electronic signatures is "permissive and not obligatory." For support, the City cites to WCT&D, LLC v. City of Kansas City, 476 S.W.3d 336, 341 (Mo. App.

2015) (holding that a neighbor's email did not constitute a signature that an applicant for a liquor license could use, and the city had not consented to accept electronic communications in any event; therefore, the UETA did not apply); and Ni, 196 Cal. App. 4th at 1653 (disallowing submission of thumb drive with electronic signatures to put initiative on California ballot). In any event, even if the UETA did apply to Yoshimura's petition, the City argued that HRS § 489E-18 provided it with discretion to accept electronic signatures, and that the ICA has previously viewed that statutory language as plain and unambiguous, citing Stone v. Administrative Director of the Courts, CAAP-16-0000405, 2019 WL 474116 (Haw. App. Sept. 27, 2019).

Because the UETA does not apply, the City argues it was free to determine in this case that it would reject electronic signatures and require residence addresses on impeachment petitions under section 12-203 of the Revised Charter.

The City argues that the City Clerk performs voter registration functions pursuant to section 3-301 of the Revised Charter[9] and HRS § 11-14.[10] When an applicant registers to vote

---

[9] Section 3-301 of the Revised Charter states, "The city clerk shall . . . conduct all voter registration functions pursuant to this charter or the laws of the state."

[10] HRS § 11-14 is titled "General county register; restrictions in use." It provides that the clerk of each county "shall register all voters in the
(continued . . .)

using a paper application, under HRS § 11-15 (2008, Supp. 2012, & Supp. 2016)[11] and HAR § 3-172-20 (2010)[12], the applicant must provide a signature.  An applicant registering to vote online must have a valid government-issued identification card with the applicant's signature on it, pursuant to HRS § 11-15.3 (Supp. 2012).[13]  The City states that proof of signature allows the City to protect its interest in detecting fraudulent or questionable signatures, citing Peroutka v. Cronin, 117 Hawai'i 323, 179 P.3d 1050 (2008).

Similarly, the City states that a signatory's residence address is "the cornerstone of becoming a registered voter," as "[a] person's residence dictates where the person can vote and for what office," citing Nader, 2008 WL 1932284, at *27-29.  The

---

(continued . . . )
clerk's county in the general county register," which "shall contain the name and address of each voter . . . ."

[11]     HRS § 11-15 is titled "Application to register" and requires a person registering to vote to submit an affidavit attesting to that person's name; Hawai'i driver's license number or Hawai'i state identification number, or, if none, the last four digits of the person's Social Security number, or, if none, a unique number assigned to the applicant for voter registration purposes; date of birth, residence, including mailing address, intent to make Hawai'i the applicant's legal residence, and citizenship.

[12]     HAR § 3-172-20 similarly requires a voter registration form to contain, among other items, a residence address and a signature.

[13]     HRS § 11-15.3 is titled "Application to register electronically."  It provides that a person seeking to register to vote electronically "consent[s]" to having election officials confirm information, including the applicant's signature, "from government databases associated with government-issued identification."  The statute goes on to state, "The applicant's signature obtained from the government database may be utilized by election officials to validate and confirm a voter's identity in any election-related matter in which a signature is necessary."

Nader opinion went on to state, "The law is clear that providing one's residence is the linchpin of being properly registered," and that the Hawai‘i State Office of Election's "practice and procedure of requiring residential addresses for confirmatory purposes is also reasonable and nondiscriminatory." Id.

### e. Yoshimura's response to the City's amicus brief

The ICA permitted both Yoshimura and Kaneshiro to submit responses to the City's amicus brief, but only Yoshimura responded. In his response, Yoshimura asserts that DocuSign "uses a tamper proof audit trail to document each electronic signature and its[] accompanying documents, and this audit trail has been cited by courts to show reliability in tracking the party that signed the document," citing 10 Moonwalkers, Inc. v. Banc of America Merchant Services, LLC, 814 S.E.2d 583 (N.C. Ct. App. 2018), and In re Henrique, 559 B.R. 900 (Bankr. C.D. Cal. 2016). He also argues there is nothing in section 12-203 of the Revised Charter calling for the use of full legible names, handwritten signatures, and residence addresses of signatories. As for the discretion of governmental agencies under HRS § 489E-18 to accept or not accept electronic signatures, Yoshimura notes that certain governmental agencies of the City and County of Honolulu, like the Honolulu Police Department, the Division of Purchasing, and the Department of Planning and Permitting, have written policies on when they will accept

electronic records, referencing HRS chapter 489E.  Thus, he argues, the City "should not be allowed to selectively deny the acceptance of electronic signatures for petitions while three different City agencies accept electronic signatures."

### 2.  Analysis

#### a.    The UETA does not apply in this case.

Although this appeal is framed in terms of reconciling HRS § 489E-7(d)'s general validation of electronic signatures and HRS § 489E-18's grant of discretion to governmental agencies to reject electronic signatures, there is a preliminary question of whether HRS chapter 489E applies at all.  HRS § 489E-3 (2008), titled "Scope," states that Hawai'i's UETA "shall apply to electronic records and electronic signatures relating to a transaction."  HRS § 489E-2 (2008) defines "[t]ransaction" as "an action or set of actions occurring between two or more persons relating to the conduct of business, commercial, or governmental affairs."

As the City points out, HRS § 489E-5(b) states, "This chapter shall apply only to transactions between parties each of which has agreed to conduct transactions by electronic means. Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct."  The legislative history to the UETA also emphasizes parties' consent.  See Sen.

Stand. Comm. Rep. No. 3265, 2000 Legislative Session ("The Act . . . only applies when parties have agreed to an electronic transaction."). The NCCUSL commentary to the model UETA explains, "[T]he paradigm for the [UETA] involves two willing parties conducting a transaction electronically, mak[ing] it necessary to expressly provide that some form of acquiescence or intent on the part of a person to conduct transactions electronically is necessary before the [UETA] can be invoked." NCCUSL Commentary at 2.

In this case, the "context and surrounding circumstances, including the parties' conduct" display that the City never agreed to conduct the certification of an impeachment petition through electronic means. As explained in the City's amicus brief, governmental agencies' acceptance of electronic signatures is "permissive and not obligatory." As further reflected in the City's amicus brief as well as its April 23, 2019 letter, it is clear the City did not agree to the use of electronic signatures as part of its process of certifying duly registered voters on impeachment petitions under section 12-203 of the Revised Charter. The City is not one of "two willing parties conducting a transaction electronically," and there is no express "acquiescence or intent on the part of [the City]."

Thus, the City Clerk's review of Yoshimura's electronic petition(s) falls outside the scope of the UETA, and beyond the

43

reach of HRS § 489E-18(a), the statute which Yoshimura argues requires the City to "determine whether, and the extent to which, it will send and accept electronic records and electronic signatures" through rulemaking under HAPA or otherwise.

Although the UETA does not apply, we proceed to address the remaining issues, also based on the public interest exception to the mootness doctrine.

> **b.** **Even if the UETA did apply, the City was not required to promulgate a rule or written policy, under HAPA or otherwise, concerning when it would accept or reject electronic signatures on impeachment petitions under section 12-203 of the Revised Charter**

Even if Hawai'i's UETA applied, the plain language and legislative history of its statutory provisions, as well as the NCCUSL's commentary to the model UETA, support the circuit court's COL 9 that HRS § 489E-18's discretionary provisions "trump" HRS § 489E-7's general validation of electronic signatures. The UETA applies to electronic transactions in business, commerce, and governmental affairs. HRS § 489E-2. HRS § 489E-7 states generally that "[i]f a law requires a signature, an electronic signature satisfies the law." When it comes to a specific subset of electronic transactions, however -- those involving governmental agencies -- there exists discretion to reject electronic signatures. See HRS § 489E-18(c) ("[T]his chapter does not require a governmental

44

agency of this State to use or permit the use of electronic records or electronic signatures.").  Under ordinary canons of construction, a more specific statute controls over a more general statute.  See, e.g., Richardson v. City & County of Honolulu, 76 Hawai'i 46, 54-55, 868 P.2d 1193, 1201-02 (1994) ("[W]here there is a 'plainly irreconcilable' conflict between a general and a specific statute concerning the same subject matter, the specific will be favored.").

The legislative history of Hawai'i's UETA also reflects a permissive, rather than mandatory, approach to the use of electronic signatures.  See Sen. Stand. Comm. Rep. No. 3265, 2000 Legislative Session ("The Act does not mandate the use of electronic signatures or records, but establishes procedural guidelines for their use . . . .").  The NCCUSL Commentary to the model UETA is in accord.  See Commentary at 52 ("Section 18 broadly authorizes state agencies to send and receive electronic records and signatures in dealing with non-governmental persons. Again, the provision is permissive and not obligatory . . . .").

In this case, the City properly exercised its discretion under HRS § 489E-18(c) to prohibit the use of electronic signatures on impeachment petitions in response to Yoshimura's inquiry.  Yoshimura argues that the City was required to have already had a written policy in place or to have promulgated a rule under HAPA setting forth when electronic signatures will

45

not be accepted on impeachment petitions, pursuant to HRS § 489E-18(a), which states, in relevant part, "[E]ach governmental agency of this State shall determine whether, and the extent to which, it will send and accept electronic records and electronic signatures to and from other persons . . . ." Under the plain language of this statute, there is no requirement that the City undergo rulemaking for section 12-203 of the Revised Charter or issue written policy statements in anticipation of the advent of electronic impeachment petitions. Therefore, the circuit court's COL 11 was correct.

To support his view of HRS chapter 489E, Yoshimura relies heavily on three out-of-state cases. The first is Anderson, 234 P.3d 1147, a Utah case. In that case, the issue was whether electronic signatures counted towards a "signed" nomination certificate for a candidate for office. 234 P.3d at 1148. Anderson, a gubernatorial candidate not affiliated with any political party, was tasked with collecting the signatures of 1000 registered voters in order to have his name placed on the ballot. Id. He collected both handwritten signatures and electronic signatures through a computer website. Id. Seven county clerks certified that the signatures he collected were valid. Id. The signatures were then submitted to the Utah Lieutenant Governor, who excised the electronic signatures as not constituting "signatures" under the Utah Election Code. Id.

46

Without the electronic signatures, Anderson did not have enough signatures to be placed on the gubernatorial ballot. Id.

Anderson filed an extraordinary writ with the Utah Supreme Court challenging the Lieutenant Governor's action. Id. The Utah Supreme Court first noted that the Utah Election Code was to be liberally construed to give unaffiliated candidates every reasonable opportunity to have access to the ballot. 234 P.3d at 1150-51. The court then noted its statutory rules of construction, as well as the UETA, defined signature to include an electronic signature. 234 P.3d at 1152. The Utah Supreme Court sided with Anderson, who pointed to the Utah UETA provision stating, "If a law requires a signature, an electronic signature satisfies the law." 234 P.3d at 1153. In so doing, it rejected the Utah Lieutenant Governor's arguments that he did not consent to the electronic transaction, and that other provisions of the Utah UETA gave him the discretion to reject electronic signatures. Id. The Utah Supreme Court concluded that the electronic transaction was not between Anderson and the Lieutenant Governor, but between Anderson and his supporters. 234 P.3d at 1155.

Turning to the Utah UETA, the court noted that one of its provisions allowed government agencies the discretion to decide when they will accept or reject electronic signatures, but only after following Utah's rulemaking procedures. 234 P.3d at 1154.

The court concluded the Lieutenant Governor could not "make informal decisions on what type of transactions cannot be supported by electronic signatures outside of the rulemaking process . . . ." Id. The Utah Supreme Court also rejected the Lieutenant Governor's argument that he did not have to accept electronic signatures under another provision of Utah's UETA that states, "[N]othing in this chapter requires any state governmental agency to: (a) conduct transactions by electronic means; or (b) use or permit the use of electronic records or electronic signatures." Id. The court's reasoning was that the provision "loses its persuasive effect" when harmonized with the rest of Utah's UETA provisions and the Utah Election Code. Id. The Utah Supreme Court thus granted Anderson extraordinary relief and ordered the Lieutenant Governor to recount the signatures submitted. 234 P.3d at 1156. The following year, the Utah state legislature overrode the Anderson case by amending the Utah Election Code to prohibit electronic signatures on petitions from unaffiliated candidates. Benjamin, 786 S.E.2d at 211. The Anderson case is distinguishable from the instant case in one key respect, and that is the Utah UETA required governmental agencies to promulgate rules before exercising discretion to accept or not accept electronic signatures. No such requirement exists in HRS § 489E-18, which

48

grants governmental agencies the discretion to accept or not accept electronic signatures.

Another UETA case Yoshimura relies on is Benjamin, 786 S.E.2d at 212, in which the West Virginia Supreme Court held that the electronic monetary contribution receipts submitted by a candidate for judicial office contained unique transaction codes that allowed individual contributors to be identified; thus, these receipts constituted electronic signatures under West Virginia's UETA and Public Campaign Finance Program. The Benjamin case is factually very different from Yoshimura's case and therefore not instructive. In this case, without residence addresses, individual signatories to Yoshimura's petition(s) could not be identified and verified as duly registered voters by the City Clerk.

The last electronic signature case Yoshimura cites is Ni, 196 Cal. App. 4th 1636, in which proponents seeking to place an initiative on the ballot submitted a thumb drive containing an electronic image of an individual's signature. 196 Cal. App. 4th at 1641. The County rejected the electronic signature as not having been "personally affixed," which the California Elections Code required, along with "personally affixing" a printed name and address. Id. The California Court of Appeal agreed, applying the California Elections Code, and not the

UETA. 196 Cal. App. 4th at 1647. Ni is, therefore, distinguishable.

None of the cases Yoshimura cites (Anderson, Benjamin, Ni) are persuasive on the issue of whether the City Clerk must accept electronic signatures, or, if the City Clerk chooses to reject electronic signatures, whether such a determination must first be promulgated via written policy or rule. Therefore, the City was free to determine, in this case, that it would require full legible names, handwritten signatures, and residence addresses in order to certify the signatories as duly registered voters of the City and County of Honolulu. Thus, the circuit court's COL 10 was correct.

To the extent the City's letter decision to reject electronic signatures itself constituted a rule that should have gone through HAPA's rulemaking procedure, our recent case, Green Party v. Nago, speaks directly to that issue. 138 Hawaiʻi 228, 378 P.3d 944 (2016). That case concerned irregularities that occurred during the 2012 election (i.e., the methodology by which the number of ballots ordered was calculated and the procedure by which votes cast on improper ballots would be counted). Id. This court held that the methodology and procedure in place to respond to those irregularities were rules that should have been promulgated by rulemaking under HAPA. 138 Hawaiʻi at 230-31, 378 P.3d at 946-47.

50

In that case, during the 2012 General Election, a number of irregularities occurred.  First, insufficient ballots were ordered for various polling places.  138 Hawaiʻi at 231, 378 P.3d at 947.  This happened because the Office of Elections had departed from its prior practice of ordering General Election ballots equal to 85% of the total number of registered voters.  138 Hawaiʻi at 233, 378 P.3d at 949.  Instead, in 2012, it decided to order General Election ballots equal to 125% of the actual number of votes cast in that year's Primary Election.  Id.  The Office of Elections did not adopt its new methodology as an administrative rule.  Id.

Next, on election day itself, poll workers delivered the wrong reserve ballots to two polling places that had run out of ballots; each polling place received the other's reserved ballots.  138 Hawaiʻi at 231, 378 P.3d at 947.  Voters at each location had the others' ballots for voting on state house of representatives, state senate, and city council races.  Id.  The Office of Elections had not adopted an administrative rule setting forth the procedure that would apply when votes are cast on ballots for an incorrect precinct, but the practice in place was to not count the votes cast in races for which the voter was not eligible to vote.  138 Hawaiʻi at 234, 378 P.3d at 950.

After the election, the Green Party filed a complaint asserting that the Office of Elections had violated HAPA by,

inter alia, failing to adopt administrative rules concerning (1) the methodology used to determine the number of ballots ordered and (2) the procedure used to count votes cast on wrong ballots.[14] Id. The circuit court granted the Office of Elections' motion for summary judgment and held that the challenged methodology and procedure concerned only the internal management of the agency and were thus not subject to HAPA's rulemaking requirement. 138 Hawaiʻi at 235, 378 P.3d at 951. The ICA affirmed the circuit court's judgment, holding that the methodology for determining the number of ballots to order in 2012 was a "one-time calculation/miscalculation" not subject to HAPA's rulemaking requirement. Id. It also held that the situation in which votes were cast on the wrong ballots was not foreseeable, and any procedure addressing that situation would be a matter of internal management; therefore, the procedure was not subject to HAPA's rulemaking requirement. 138 Hawaiʻi at 236, 378 P.3d at 952. We vacated the ICA's judgment to the extent that it affirmed the circuit court's judgment on the basis that HAPA's rulemaking requirement did not apply to the methodology for ordering ballots and the procedure for counting

---

[14]    The Green Party also alleged that the Office of Elections was required to adopt a rule regarding the procedures by which a precinct requests additional paper ballots. 138 Hawaiʻi at 234, 378 P.3d at 950. We concluded, however, that there was no evidence of any established procedure addressing this situation; therefore, there was no "rule" in place subject to HAPA's rulemaking requirement in this instance. 138 Hawaiʻi at 242, 378 P.3d at 958.

votes cast on the wrong ballots.  138 Hawai'i at 243, 378 P.3d at 959.  We remanded the case to the circuit court for it to order that the methodology and procedure challenged by the Green Party were indeed invalid.  138 Hawai'i at 235, 378 P.3d at 951.

In so doing, we first noted that the relevant question was whether the Office of Elections' (1) methodology for ordering ballots and (2) procedure for counting votes on the wrong ballots amounted to the "adopt[ion of] rule[s], and if so, . . . whether the rule[s were] valid."  138 Hawai'i at 237, 378 P.3d at 954.  We first noted the distinction between an agency statement that is "legislative," and thus requires rulemaking, and an agency statement that is "adjudicatory," which does not.  138 Hawai'i at 238, 378 P.3d at 954.  A "legislative" agency statement "operates in the future" and has a "general effect," while an "adjudicative" agency statement is "backward looking" and "concerned with the determination of past and present rights and liabilities of individuals where 'issues of fact often are sharply controverted.'"  138 Hawai'i at 238, 240, 378 P.3d at 954, 956. (citations omitted).

In Green Party, we noted that, if the Office of Elections' (1) methodology for ordering ballots or (2) procedure for counting votes on the wrong ballots "qualif[ied] as 'rules' as defined in HAPA, then they [were] invalid for not complying with

HAPA's statutory rulemaking requirements."  138 Hawai'i at 238, 378 P.3d at 954.  As to the Office of Elections' 2012 methodology for ordering ballots, we held it was a rule because it was of "general applicability and . . . future effect."  138 Hawai'i at 240, 378 P.3d at 956.  We noted the ballot order determination was not a "backward-looking" "one-time calculation/miscalculation," as it was intended to have a future effect upon the ballots ordered for the upcoming election.  Id. We concluded that the Office of Elections was required to have adopted the methodology pursuant to the rulemaking requirement under HAPA.  138 Hawai'i at 242, 378 P.3d at 958.

As to the procedure for votes cast on the wrong ballots, we held that the Office of Elections appeared to have a procedure in place for counting votes on the wrong ballot:  votes were counted for only those races for which the voter was eligible to vote and not counted for those races for which the voter was ineligible to vote.  Id.  Such a procedure thus demonstrated the "general applicability and future effect" characteristics of a rule and should have been promulgated as a rule pursuant to HAPA.  138 Hawai'i at 242-43, 378 P.3d at 958-59.

In the instant case, the City's determination to reject electronic signatures resembles neither the Office of Elections' (1) methodology for ordering ballots for an upcoming election, nor (2) its procedure for counting votes cast on the wrong

ballots. First, unlike the Office of Elections' methodology for ordering ballots for an upcoming election, which was of general applicability and future effect, the City's determination to reject electronic signatures was an ad hoc, backward-looking decision made in the specific context of Yoshimura's inquiries with regard to these impeachment petitions. Second, unlike the Office of Elections' pre-existing procedure for counting votes cast on the wrong ballots, the City had no pre-existing policy for accepting or rejecting electronic signatures on an impeachment petition under section 12-203 of the Revised Charter. In fact, the City had deferred to the circuit court for months to adjudicate whether electronic signatures should be accepted before ultimately deciding to reject them. Thus, the City's determination to reject electronic signatures was not a "rule" subject to HAPA's rulemaking requirements. The circuit court's COL 11 was therefore correct.

      **c.   Requiring handwritten signatures and residence addresses is rationally related to preventing fraud in impeachment petitions under section 12-203 of the Revised Charter**

Hawai'i courts have already weighed in on the propriety of requiring handwritten signatures and residence addresses to verify signatories to a petition. In Nader, 2008 WL 1932284, the United States District Court for the District of Hawai'i addressed the requirements for placing two presidential

55

candidates on the Hawai'i ballot.  In that case, two presidential candidates (Michael A. Peroutka and Ralph Nader) were required to collect the number of signatures equal to 1% of the votes cast in the last presidential election in order to be placed on the ballot, pursuant to HRS § 11-113.  2008 WL 1932284, at *4. A form petition for that purpose required, among other things, a signature and residence address.  Id.  Both candidates fell short of the number of signatories necessary, and each brought suit in federal court challenging the information necessary to confirm signatories.  Id.  The federal court stated the following:

> 18.  [A] residence address is required in order to determine if a signatory is in fact who he or she claims to be and in ascertaining whether the individual is a "currently registered voter" in terms of being qualified to sign the petition.
>
> 19.  The residence address is the cornerstone of becoming a registered voter.  A person's residence dictates where the person can vote and for what office. . . .
>
> 20.  . . . The law is clear that providing one's residence is the linchpin of being properly registered.  Therefore, the Court finds that the Office of Elections' practice and procedure of requiring residential addresses for confirmatory purposes is also reasonable and non-discriminatory.

2008 WL 1932284, at *10.

Addressing the same challengers (Peroutka and Nader) in a related proceeding, this court held, with respect to the Office of Elections' procedures for verifying handwritten signatures, "In light of the state's interest in detecting fraudulent or questionable signatures, we cannot say that it was clearly

56

erroneous for the Chief Elections Officer to reject a signature because the signatory provided a different address on the petition form than was provided in the SVRS." Peroutka, 117 Hawai'i at 330.  Thus, both cases support the circuit court's COLS 8 and 10 that the City could require full legible names, handwritten signatures, and residence addresses in order to certify Yoshimura's petition(s) and in order to prevent fraud.

**C.   The circuit court did not abuse its discretion in denying Yoshimura's motion for leave to amend his petition**

Yoshimura also argues the circuit court should have granted him leave to amend his petition, because amendment was not futile.  Again, he cited Keawe, 65 Haw. 232, 649 P.2d 1149, for the proposition that leave to amend a complaint should be freely given, absent any apparent or declared reason, such as undue delay, bad faith, or dilatory motive on the part of the movant, or a repeated failure to cure deficiencies in the complaint.  To support his position, he argues that the circuit court erred in concluding that the City had the discretion to reject electronic signatures.

In his answering brief, Kaneshiro counter-argues that Yoshimura's second amended petition was futile; therefore, the circuit court did not abuse its discretion in denying Yoshimura's leave to amend.  Specifically, Kaneshiro states that the proposed second amended petition did not attach a new or

57

separate petition; instead, it relied on the same DocuSign petition that did not meet the filing requirements of section 12-203 of the Revised Charter (500 handwritten signatures of duly registered Honolulu voters).

In this case, amendment was futile. Yoshimura made it clear in his proposed second amended petition that he would not support his impeachment petition with handwritten signatures or residence addresses, despite the City's position on the information it would need to certify his petition. Thus, the second amended petition would have been dismissed, for the same reasons the first amended petition was dismissed. Therefore, the proposed second amended petition was futile. See Adams v. Dole Food Co., 132 Hawai'i 478, 488, 323 P.3d 122, 132 (App. 2014) (citing Office of Hawaiian Affairs v. State, 110 Hawai'i 338, 365, 133 P.3d 767, 794 (2006) ("Where proposed amendments to a complaint would not survive a motion to dismiss, this court should affirm the denial of leave to amend on futility grounds."). The circuit court did not abuse its discretion in denying Yoshimura's motion for leave to amend.

D. **The circuit court did not abuse its discretion in denying Yoshimura's motion for reconsideration.**

Lastly, Yoshimura argues that the circuit court erred in denying his motion for reconsideration, because he provided legal authority the circuit court overlooked in concluding HRS

§ 489E-18 did not require it to have a pre-existing written policy or rule concerning whether it would accept electronic signatures on impeachment petitions.

In his answering brief, Kaneshiro counter-argues that Yoshimura could have brought his arguments previously in opposition to his motion to dismiss; therefore, the circuit court did not abuse its discretion in denying Yoshimura's motion for reconsideration.

In this case, the circuit court did not abuse its discretion in denying Yoshimura's motion for reconsideration, because all of the legal authority Yoshimura marshaled to support his motion for reconsideration (the federal ESIGN Act, HAPA, and the Anderson case) could have been raised earlier in the litigation, in opposition to Kaneshiro's motion to dismiss or cross-motion to strike.  Yoshimura's motion for reconsideration merely sought to relitigate old matters. Consequently, the circuit court did not abuse its discretion in denying his motion for reconsideration.  See, e.g., Chen v. Mah, 146 Hawai'i 157, 172, 457 P.3d 796, 811 (2020) ("'[T]he purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion.' Reconsideration is not a device to relitigate old matters or to

raise arguments or evidence that could and should have been brought during the earlier proceeding.") (citation omitted).

**E.    The circuit court properly dismissed the case for lack of jurisdiction**

Yoshimura asserts "there is very little guidance in the City Charter provision on what is required for an impeachment petition."  The Mansho order, No. 24858, interpreted Section 12-202 of the Revised Charter, which governs impeachment of a City Councilmember.  When that order was issued, Section 12-202 designated this court to serve as "a board of impeachment in any proceeding for the removal of a councilmember," upon presentation of a "charge . . . set forth in writing in a petition for impeachment signed by not less than one thousand duly registered voters of the council district for the removal of a council member, and said signatures shall be necessary only for the purpose of filing the petition."  In Mansho, upon receipt of the petition, this court filed an order stating that one "preliminary issue" was "whether the signatures in support of the petition [we]re the signatures of registered voters in the Council District 1 of the City and County of Honolulu." Mansho, No. 24858.  This court ordered the petitioners to submit a copy of the petition with its signature pages to the Clerk of the City and County of Honolulu, who would then review the signatures and submit a declaration as to whether the petition

was signed by at least one thousand duly registered voters from the councilmember's district. <u>Mansho</u>, No. 24858. The councilmember who was the subject of that impeachment petition resigned before further proceedings could be had in this court.

As indicated by the <u>Mansho</u> order, the requisite number of signatures are necessary for the purpose of filing an impeachment petition. In this case, there was no showing of the signatures necessary to support Yoshimura's impeachment petition(s). Therefore, the circuit court properly dismissed the case for lack of jurisdiction.

## V. Conclusion

For the foregoing reasons, we affirm the circuit court's (A) November 15, 2019 Final Judgment; (B) Findings of Fact, Conclusions of Law, and Order: (1) Denying Petitioner's Motion for Leave to Amend Petition and to Name City Clerk as a Respondent in a Declaratory Judgment Complaint, (2) Denying Respondent Keith M. Kaneshiro's Cross-Motion to Strike Petitioner's Motion for Leave to Amend Petition and to Name City Clerk as a Respondent in a Declaratory Judgment Complaint, and (3) Dismissing Case for Lack of Jurisdiction Filed on August 19,

2019; and (C) Order Denying Petitioner's Motion for

Reconsideration Filed on October 2, 2019.

Keith M. Kiuchi                    /s/ Mark E. Recktenwald
for plaintiff-appellant

                                   /s/ Sabrina S. McKenna
William C. McCorriston
(David J. Minkin,                  /s/ Michael D. Wilson
Nadine Y. Ando,
and Jordan K. Inafuku              /s/ Todd W. Eddins
with him on the briefs)
for defendant-appellee             /s/ James H. Ashford

